Jones *v.* Mississippi Farms Co.

[76 South. 880, In Banc.]

1. Damages. *Provisions for liquidated damages.*

Under a contract for the sale of a railroad providing, that time was of the essence of the contract, that it was to be taken strictly and literally, that on the event of failure to make installment payment strickly and promptly, the contract should be null and void, the rights of the purchaser to cease at once *ipso facto,* that the property should revert and immediately reinvest in the seller, without any declaration of forfeiture or act of reentry and without any other act, as fully and perfectly as if the contract had never been made, and that the moneys paid should be held absolutely as liquidated damages for the purchaser's breach.   In such case the moneys paid under the contract by the purchaser before his refusal to continue were liquidated damages and not a penalty.

2. Constitutional Law. *Right to contract. Fourteenth amendment.*

It is fundamental that the right to make contracts pertaining to business is one of the rights guaranteed by the law of the land, and especially the fourteenth amendment to the Constitution of the United States.

3. Contracts. *Absence of modification. Enforcement.*

Unless the parties dealing with the subject-matter by their conduct modify or change the contract originally made, or so act in reference to it as to make it inconsistent for a party to claim or rely upon the contract contrary to its agreement and stipulations, it must be enforced as written.

4. Damages. *Liquidated damages or penalty.*

In construing a contract to determine whether a clause calls for liquidated damages or a penalty, the intention of the parties is the thing the court is anxious to ascertain and give effect to.

5. Same.

The general rule is that the intention of the parties must be drawn from the words of the whole contract, and if viewing the language used, it is clear and explicit, then the court must give effect to the contract unless it contravenes public policy. If the language is doubtful, the court will look to the surroundings of the parties and to the construction placed upon the contract by the parties during its existence in order to learn the intention of the parties.

6. Damages. *Liquidated damages or penalty.*

In considering whether or not damages stipulated for as liquidated damages was intended by the parties really to be paid, if not disproportionate to the damages that might probably result from a violation of a contract, it will be held to be liquidated damages. If the contract is for the performance of a specific act for the nonperformance of which damages could easily be ascertained, then it may be treated as a penalty.

7. Specific Performance. *Contract requiring superintendance of court.*

Equity will not direct a specific performance of a contract where it would require constant superintendance of the court from day to day for an indefinite time in order to enforce the carrying out of its decrees.

8. Contracts. *Breach. Recovery by corporation not party.*

A corporation not a party to a contract cannot recover for its breach the damages it may have suffered therefrom; if it can recover anything, it is only as assignee of a party to the contract.

9. Corporations. *Exceeding charter powers. Recovery of damages.*

A foreign corporation which had no charter power to make a contract for the development of cut over timber lands cannot maintain a suit for damages for breach of a contract to purchase a railroad from it, ancillary to the development scheme, except as the damages are stipulated in the contract.

Appeal from the chancery court of Harrison county.
Hon. W. M. Denny, Jr., Chancellor.

Suit by the Mississippi Farms Company against J. T.
Jones.  From a judgment for plaintiff, both sides appeal.

On the 8th day of May, 1909, Finkbine Lumber Company, a corporation of Iowa, doing business at Wiggins,
Miss., and owning a lumber railroad extending from
Wiggins about twenty-four miles southeast, entered into
a contract with J. T. Jones for the sale of the logging
railroad; J. T. Jones being the owner of the majority of
the capital stock of the Gulf & Ship Island Railroad,
which said railroad was intersected by the logging railroad at Wiggins, Miss.  The contract provided for the
sale of the road at and for the sum of two hundred and
twenty-five thousand dollars, thirty thousand dollars of
which was paid in cash, and fifteen thousand dollars to
be paid on the 10th day of January, 1910, and fifteen
thousand dollars on the 10th day of January of each
and every year thereafter until the full purchase price
had been paid.  The contract consisted of twelve paragraphs, but in substance the contract provided: That the
Finkbine Lumber Company should have the use of the
said road free of toll in the transportation of its commodities, supplies, officers, servants, and employees with
its own engines and cars and train crews as long as it
should maintain its sawmills and planing mills or any of
them upon the main line of the road and until all the
timber then owned or thereafter acquired by the said
Finkbine Lumber Company was exhausted, and to make
and maintain connections, spurs, and laterals at such
places as it might find needful or convenient in the conduct of its business, and that, as the operation of the
logging road might not be begun by Jones for some time
after the execution of the contract, the Finkbine Company should maintain at its own cost and keep the main
line with bridges, culverts, etc., in repair, but that, whenever Jones began to use the main line road for the op-

eration of trains, then the cost of maintaining and repairing the bed and track of the main line, other than the cost of steel, shall be paid by the parties in proportion to the amounts of tonnage carried by each, but provided that the Finkbine Company should not be bound to maintain and repair the main line after it had discontinued the use thereof, but that such use should not be discontinued until it had given Jones at least six months' notice of its purpose to do so; that from the time Jones began the use of the said main line for the operation of trains the Finkbine Company should be under the reasonable direction of the train dispatcher or other officer of Jones in the operation of its trains and that, if Finkbine Company disobeyed any such reasonable rules and regulations made by Jones after such use was begun by Jones, it should be liable for any injuries caused thereby and that each of the parties should, when using said roads, exercise due care in the selection of engines, cars, equipment, and servants, and that Jones should be liable to the Finkbine Company for all negligent and tortious acts of Jones' employees, and should hold Finkbine Company harmless from such negligence of such employees; that no interest should be charged upon the deferred installments of the consideration until Jones began the use of the road but thereafter such deferred payments should bear four per cent. per annum interest. The contract also provided for a system of accounting between the parties, and that when Jones paid the purchase money the Finkbine Company should execute conveyances for the said logging road. Then follows clause 11 of the contract, which reads as follows:

"11. In event the party of the second part shall fail to make payments to the party of the first part, as above provided, or any of them punctually and upon the times above limited strictly and literally, the said times of payments and each of them being the essence of this contract, then and in any such event this contract shall be null and

void, and thereupon all rights and interest thereby granted to or then existing in favor of the party of the second part shall utterly cease and determine, and the property hereby sold, together with all improvements and betterments thereof shall immediately revert and reinvest in the party of the first part, without any declaration or forfeiture or act of re-entry and without any other act of the party of the first part to be performed, and without any right of the party of the second part of reclamation or compensation for moneys paid or improvements made hereunder or upon said property as absolutely and perfectly as if this contract had never been made. It being the intention that said payments and improvements shall be held by the party of the first part absolutely as liquidated damages for the breach of this contract.''

By section 12 of the contract it is provided that the term ''party of the first part'' shall be applied to and include the successors and assigns of the Finkbine Company, and that the party of the second part should include the assigns, heirs, and legal representatives of Jones. This contract seems to have been in furtherance of a scheme of colonization and development of the territory contiguous to Wiggins, Miss., and contemplated that the Finkbine Company should sell and develop cutover lands owned by it along and contiguous to the logging railroad and to the Gulf & Ship Island Railroad. Considerable correspondence passed and also personal conferences concerning the development project between J. A. Jones, the son of J. T. Jones, and the manager of the Finkbine Company.

On March 9, 1911, a supplemental contract was entered into between J. T. Jones and the Finkbine Company, in which it was provided that, whereas the contract of May 8, 1909, had fixed no time for the commencement of the operation of the said road by Jones, in consideration of the other contract and of one dollar each to the other in hand paid and receipt acknowledged, it was agreed that

Jones shall within six months after receiving written notice from the Finkbine Company of its discontinuance of the operation of the main-line logging road, and upon the vacation of the road by the Finkbine Company, Jones will within six months equip, maintain, and operate said main line road from Wiggins to Tiger Branch for a period of three years, and during the said time run at least one train each way daily, except Sunday, carrying passengers, and furnish such facilities for the transportation of freight as in the judgment of Jones may be required, and that the Finkbine Company was not bound to maintain the roadbed, ties, culverts, or any portion thereof after it should cease to use said road, and provided that, whereas Finkbine Company has ceased to use the east twelve miles of the main line of the logging road, and it was desirable to maintain thereafter until such times as Jones could enter upon the operation, the Finkbine Company would employ such labor and furnish such material as may be necessary to maintain the east twelve miles of such line, keeping an account thereof, and that the same would be paid by Jones in monthly sums not to exceed two hundred and fifty dollars per month. And it was further provided that this contract shall not alter or affect in any respect any of the provisions of the said contract of May 8, 1909, except as specifically stated. The Finkbine Company not having abandoned the use of said road, and Jones not having begun the operation thereof on the 5th day of September, 1913, Jones wrote to Finkbine Company giving notice that on the next period for payment he would default and decline to make any further payment on the contract, having paid at that time a total amounting to one hundred and two thousand dollars. This letter, in full, is as follows:

"It will be some time until the payment becomes due, the failure to meet which would, by the terms of the contract render it null and void, but thinking that you are entitled to notice of my intention in that respect I wish

to advise you that I will make no further payments upon the contract executed on the 8th day of May, A. D. 1909, and that consequently you may now consider that contract, together with the agreements supplementary thereto, dated respectively the 8th day of March, A. D. 1911, and October 26, A. D. 1911, canceled and henceforth inoperative. Of course the property about which the agreements were made now reverts to you."

To this letter Finkbine Company replied as follows:

"Your letter of September 23d came duly to hand, but inasmuch as our Mr. W. E. Guild was absent from the city we have withheld answer to same until his re-turn.

"We are sorry that you do not look at this matter the same way as we do, as we feel assured that our view of it is correct. We realize that you have a perfect right to stop payment on the road that you bought, but we are sure that you have not a right to refuse to operate the road for three years from the time we gave notice of turning it over to you as stated explicitly in the secondary contract, and we must reiterate what we said in a previous letter in regard to your operating the road."

Jones refused to make the payment, and the Finkbine Company insisted that he should make the payment. The Finkbine Lumber Company after the execution of the contract of May 8, 1909, and before the operating contract of 1911, caused the Mississippi Farms Company to be organized for the purpose of carrying out a development scheme contemplated by the parties; the Finkbine Lumber Company having no charter power to engage in buying and selling lands generally and in farming and developing them. It sold its entire holdings to the Mississippi Farms Company at an average price of six dollars per acre. The Mississippi Farms Company was created by declaring a stock dividend of the Finkbine Company and organizing the stockholders, to whom his stock dividend was given, into a corporation called the

Mississippi Farms Company. After the refusal of Jones to carry out the contract, Finkbine Lumber Company assigned its contracts with Jones to the Mississippi Farms Company, and the Mississippi Farms Company filed suit in the chancery court of Harrison county on the 1st day of August, 1914, setting out the contracts between the Finkbine Lumber Company and J. T. Jones and the assignment of said contracts to it, and for damages incurred or sustained by the Mississippi Farms Company by reason of its buying the lands from the Finkbine Company, and also from other parties, in undertaking to carry out the development scheme contemplated by the Finkbine Company and J. T. Jones. It appears that the Mississippi Farms Company at considerable expense advertised farm lands and induced certain. Slavs and Poles residing in the north to move to Mississippi, selling lands along the lines of the logging road to such people at an average price of twenty-six dollars per acre. It appears that the colonization scheme was a failure, and that the Slavs and Poles failed to make good and abandoned their contracts for the payment of the land and moved away.

On the hearing the chancellor declined to decree specific performance except to render a judgment against J. T. Jones for the balance of the purchase money under the contract of May 8, 1909, and the supplemental contract or contract involving an additional two miles of the road, but decreed in lieu of specific performance damages in the sum of sixty thousand dollars. From this judgment both complainant and defendant in the court below appeal.

*R. E. Eaton, Mayes, Wells, May & Sanders* and *Mayes & Mayes,* for appellant.

*Green & Green* and *White & Ford,* for appellee.

ETHRIDGE, J., delivered the opinion of the court.

(After stating the facts as above.)   The direct appeal
is prosecuted by J. T. Jones, and he contends that under
clause 11 above set out he was not compelled to perform
the contract, but had the option of retiring at any time
he saw proper, and that clause 11 at all events fixed the
damages which should be paid for a default in the con-
tract.   He contends further that the Mississippi Farms
Company, not being a party to the contract, can recover
no damages suffered by it by reason of the failure of
Jones to carry out the contract to buy and operate the
railroad.   The Farms Company claims that it is not
only entitled to a decree for the balance of the purchase
money of the road, but that it is entitled to damages for
moneys expended, and profits lost, by it in carrying out
the development scheme or undertaking to do so con-
templated by Jones and the Finkbine Company.

It appears to us that clause 11 of the contract was
made with the view of fixing damages for the failure
to carry out this contract, and that the moneys paid un-
der this contract are to be considered as liquidated dam-
ages and not as a penalty.   Under this clause, it is de-
clared by the parties that time is the essence of this
contract, and that it is to be taken strictly and literal-
ly; and that, upon the event of the failure to make the
payment strictly and promptly as of the date, the con-
tract is to be null and void and the rights of Jones were
to cease at once *ipso facto,* and the property should re-
vert and immediately reinvest in the Finkbine Company
without any declaration or forfeiture or act of re-entry
and without any other act to be performed by it, as fully
and as perfectly as if the contract had never been made;
and that the moneys paid should be held absolutely as
liquidated damages for the breach of the contract.   It
is difficult to conceive of how any stronger contract
could be made than the one that is here made bearing
upon this matter.

It is fundamental that the right to make contracts pertaining to business is one of the rights guaranteed by the law of the land, and especially the fourteenth amendment to the Constitution of the United States. Unless the parties dealing with the subject-matter by their conduct modify or change the contract originally made, or so act in reference to it as to make it inconsistent for a party to claim or rely upon the contract contrary to its agreement and stipulations, it must be enforced as written. To quote from the United States supreme court in *Cheney* v. *Libby,* 134 U. S. 68, 10 Sup. Ct. 498, 33 L. Ed. 818:

"The parties in this case, in words too distinct to leave room for construction, not only specify the time when each condition is to be performed, but declare that 'time and punctuality are material and essential ingredients' in the contract; and that it must be 'strictly and literally' executed. However harsh or exacting its terms may be, as to the appellee, they do not contravene public policy; and therefore a refusal of the court to give effect to them, according to the real intention of the parties, is to make a contract for them which they have not chosen to make for themselves"—citing authorities.

In the headnotes to this case in the Law Edition report these principles are stated as follows:

"Time may be made of the essence of the contract by the express stipulations of the parties, or it may arise by implication from the very nature of the property, or the avowed objects of the seller or the purchaser.

"Where the parties specify the time of performance, and declare that 'time and punctuality are material and essential ingredients' in the contract, and that it must be 'strictly and literally' executed, however harsh or exacting its terms may be, a refusal of the court to give effect to them is to make a contract which the parties have not made for themselves."

The United States supreme court has recognized these principles in numerous other cases, among which I cite the following: *Taylor* v. *Longworth*, 14 Pet. 172, 10 L. Ed. 405; *Secombe* v. *Steele*, 20 How. 94, 15 L. Ed. 833; *Waterman* v. *Banks*, 144 U. S. 394, 12 Sup. Ct. 646, 36 L. Ed. 479. See also *Slater* v. *Emerson*, 19 How. 224, 15 L. Ed. 626, *Bank of Columbia* v. *Hagner*, 1 Pet. 455, 7 L. Ed. 219, *Heppurn & Dundas* v. *Colin Auld, etc.*, 5 Cranch, 262, 3 L. Ed. 96. That time will be regarded as the essence of the contract when stipulated by the parties by distinct agreement is well settled in numerous state authorites. *Davis* v. *Isenstein*, 257 Ill. 260, 100 N. E. 940, 45 L. R. A. (N. S.) 52; *Heckman's Estate*, 236 Pa. 193, 84 Atl. 689; *Hahn* v. *Concordia Society*, 42 Md. 460; *Bodina* v. *Glading*, 21 Pa. 50, 59 Am. Dec. 749; *St. Mary's Church* v. *Stockton*, 8 N. J. Eq. 520; *Webster* v. *Bosanquet*, Ann. Cas. 1912C, 1019; *Phelps* v. *I. C. R. R. Co.*, 63 Ill. 468; *Stow* v. *Russell*, 36 Ill. 18; *Heckard* v, *Sayre*, 34 Ill. 142; *Steele* v. *Biggs*, 22 Ill. 643; *Chrisman* v. *Miller*, 21 Ill. 227; *Ewing* v. *Crouse*, 6 Ind. 312; *Foot* v. *Rush*, 100 Iowa, 522, 69 N. W. 874; *Carter* v. *Walters*, 91 Iowa, 727, 59 N. W. 201; *Garcin* v. *Pennsylvania Furnace Co.*, 186 Mass. 405, 71 N. E. 793; *Judd* v. *Skidmore*, 33 Minn. 140, 22 N. W. 183; *Jewett* v. *Black*, 60 Neb. 173, 82 N. W. 375; *Brown* v. *Ulrick*, 48 Neb. 409, 67 N. W. 168; *Patterson* v. *Murphy*, 41 Neb. 818, 60 N. W. 1. In the case of *Webster* v. *Bosanquet, supra,* we quote from the headnote as follows:

"Where a contract provides that on breach thereof a specified amount should be paid 'as liquidated damages and not as a penalty,' its true construction must have regard to the particular circumstances of the case, and not be such as to render it unconscionable and extravagant. Where it is impossible at the date of contract to foresee the extent of uncertain injury which might be sustained by its beach, or the cost and difficulty of providing

it, and the amount is reasonable, it should be recovered as liquidated damages.''

Are there any such surroundings and circumstances in the present case as would warrant us in construing the stipulation of the contract contained in clause 11 as a penalty and not as liquidated damages within the meaning of the rule laid down in this case? When we take the surroundings of the parties into consideration and consider the uncertainty of the venture about which the parties were contracting and the extreme difficulty of proving damages in the case of a failure, it becomes manifest that the parties were themselves fixing what the damages should be. In the case of Jones' failure to pay for the logging road, the Finkbine Company would have all the property which it had conveyed to Jones, and, in addition thereto whatever Jones had paid to it, the cash payment being thirty thousand dollars, and fifteen thousand dollars, additional accruing each year thereafter as the payments were made. Both Jones and the lumber company were persons experienced in business matters and well knew the uncertainty of a venture of this kind. They took particular pains to make their intentions manifest that the contract was to be terminated at once in case of default. and that this amount so paid would be the exact amount of damages that would be suffered from such breach.

Of course, the intention of the parties is the thing the court is anxious to ascertain and give effect to. The general rule is that the intention of the parties must be drawn from the words of the whole contract, and if, viewing the language used, it is clear and explicit, then the court must give effect to this contract unless it contravenes public policy, if the language is doubtful, the court will look to the surroundings of the parties and to the construction placed upon the contract by the parties during its existence in order to learn the intention of the parties.

In considering whether or not damages stipulated for as liquidated damages was intended by the parties really

to be paid if not disporportionate to the damages that might probably result from a violation of a contract, it will be held to be liquidated damages.  If the contract is for the performance of a specific act for the nonperformance of which damages could easily be ascertained, then it may be treated as a penalty.  The whole subject is treated in a case note to Ann. Cas. 1912C, 1021-1028.  See, also, *Selby* v. *Matson,* 137 Iowa, 97, 114 N. W. 609, 14 L. R. A. (N. S.) 1210; *Morrison* v. *Ashburn* (Tex. Civ. App.) 21 S. W. 993; *Lightner* v. *Menzel,* 35 Cal. 452; *Dakin* v. *Williams,* 17 Wend. (N. Y.) 447; *Holmes* v. *Holmes,* 12 Barb. (N. Y.) 137; *Welch et al.* v. *McDonald,* 85 Va. 500, 8 S. E. 711; *Pettis* v. *Bloomer,* 21 How. Prac. (N. Y.) 317; *Barnwell* v. *Kempton,* 22 Kan. 314; *Geiger et al.* v. *West Maryland R. R. Co.,* 41 M. D. 4; *K. P. Mining Co.* v. *Jacobson,* 30 Utah, 115, 83 Pac. 728, 4 L. R. A. (N. S.) 755.

On the proposition of compelling the operation for three years in the supplemental contract, our own court has held, in *Sims* v. *Vanmeter Lumber Co.,* 96 Miss. 449, 51 So. 459, that equity will not direct a specific performance of a contract where it would require constant superintendence of the court from day to day for an indefinite time in order to enforce the carrying out of its decrees.  This case refused specific performance of a contract for the construction of a logging road.  See, also, *Bomer et al.* v. *Canaday,* 79 Miss. 222, 30 So. 638, 55 L. R. A. 328, 89 Am. St. Rep. 593.

On the proposition of allowance of damage in lieu of specific performance, we think that the appellees cannot recover because the Mississippi Farms Company, not being a party to the contract, cannot recover from the appellant the damages it may have suffered in its dealings in this respect.  If it could recover anything, it would be limited to the recovery of such damages as were suffered by the Finkbine Lumber Company under assignment of Finkbine's contract to the Mississippi Farms Company.  The Finkbine Company has not suffered damage, because it

sold its property at an average of six dollars per acre, when the proof shows that its real value is approximately two dollars per acre. The Finkbine Company will be precluded from maintaining suit for damages as to the development project independent of clause 11, because it had no charter power to make a contract as to the development proposition. *Central Transportation Co.* v. *Pullman's Palace Car Co.*, 139 U. S. 24, 11 Sup. Ct. 478, 35 L. Ed. 55; *McCormick* v. *Market National Bank*, 165 U. S. 538, 17 Sup. Ct. 433, 41 L. Ed. 817.

The case is therefore reversed, and bill and cross-bill dismissed.

*Reversed and dismissed.*

STEVENS, J. (dissenting.) In any analysis of the issues in this case, the situation of the contracting parties and all the provisions of the contracts here presented for construction must be clearly understood and kept in mind. For this reason I am setting out the contracts in full and in the chronological order, with a brief statement of their relationship one to the other.

In the year 1909, appellant J. T. Jones owned the capital stock of the Gulf & Ship Island Railroad, and his son, J. A. Jones, was the first vice president of the said railroad company and the attorney in fact of his father, J. T. Jones. The power of attorney was properly evidenced by writing. The management of the Gulf & Ship Island Railroad was under the control of Capt. J. T. Jones, and his voice in all matters of policy was the dominant voice and his judgment the ultimate authority. The Finkbine Lumber Company, while an Iowa Corporation, owned a large sawmill at Wiggins on the line of the said Gulf & Ship Island Railroad, and in the operation of its sawmill business had constructed and owned twenty-four miles of logging road extending from Wiggins southeast to Tiger Branch. This logging road had been substantially constructed as a standard

gage railroad with a view of making it some day a common carrier. The Finkbine Company owned approximately twenty-five thousand acres of land, a large part of which had been cut over and which lay contiguous to the said logging railroad. The Gulf & Ship Island Railroad as well as the said logging railroad pentrated the yellow pine belt of South Mississippi, and the Gulf & Ship Island had been obtaining its principal tonnage from the lumber business. As the pine timber was denuded, it was to the advantage of the Gulf & Ship Island Railroad and its owner, Capt. J. T. Jones, to encourage the development of the cut-over pine lands along the line of said railroad. It was also to the interest of Capt. Jones to control the tonnage that might ultimately be derived from or routed over the said logging railroad. The Finkbine Company, on the other hand, desired to consumate a sale of its logging road when the timber holdings of said company had been cut and lumbered. To this end the Finkbine Company had entered into negotiations for a sale of the said road to the Mississippi Central Railroad Company, which was then extending a line southeast from Hattiesburg to some point on the Gulf Coast. It is the theory of the appellee, supported by its testimony, that negotiations were then opened between Capt. J. T. Jones and the Finkbine Company for the purchase of the Finkbine logging road, and that as a matter of policy the logging railroad was bought by Capt. Jones instead of by the Gulf & Ship Island Railroad Company, but in order that the stock held by Capt. Jones in the Gulf & Ship Island Railroad would be more valuable. After several conferences, the following contract was thereupon executed:

"This agreement between the Finkbine Lumber Company, a corporation, hereinafter called the party of the first part, and Joseph T. Jones, hereinafter called the party of the second part, witnesseth:

"1. That the party of the first part, for the considerations and subject to the rights, conditions and reserva-

tions hereinafter expressed, agrees to sell to the party of the second part the main line of the logging railroad, hereinafter called 'main line road' owned by the party of the first part, described as follows, to wit: Beginning at the intersection of the said main line road with the Gulf & Ship Island Railroad at Wiggins, Mississippi, and extending thence continuously and in a southeasterly direction to the stream called Tiger Branch in section 18, township 3 south, range 8 west of St. Stephens Meridian; a distance of about twenty-four miles, together with all of the right of way one hundred feet on each side from the center of the main line road over the land now owned by the Finkbine Lumber Company, together with such other title to right of way as they may now possess (and the said Finkbine Lumber Company, wherever it can do so at a reasonable price, agrees to obtain a right of way of one hundred feet on each side of said main line road) grades, embarkments, bridges, culverts, ties and rails of said main line road, but excepting therefrom and reserving to the party of the first part all spurs, laterals, switch tracks, engine house, machine shops, cars, locomotives, machinery, tools and appliances used on said main line road or connected or in connection therewith.

"2. The party of the second part agrees to pay to the party of the first part for said main line road the sum of two hundred and twenty-five thousand dollars ($225,000) in installments as follows: Thirty thousand ($30,000) dollars within ———— days after the date of signing of this agreement, and fifteen thousand ($15,000) dollars on the 10th day of January, A. D. 1910, and fifteen thousand ($15,000) dollars on the 10th day of January of each and every year thereafter until said consideration is fully paid.

"3. The party of the first part reserves the right, without paying any toll, charge or compensation whatsoever therefor, to use said main line road for the operation of

its trains and the transportation of its commodities, sup-
lies, officers, servants and employees, under and with
its own engines, cars and train crews so long as the party
of the first part, its successors or assigns shall maintain
its sawmills and planing mills or any of them upon or
along said main line road at their present location or else-
where, and until all of the timber now owned or here-
after acquired by the party of the first part tributary to
said main line road, or that may be conveniently trans-
ported over the same, is exhausted.

"And the party of the first part also reserves the right
throughout the entire period during which it shall con-
tinue to use said main line road, to make and maintain
such connections with said main line road by spurs,
laterals and switch tracks, and from time to time change
the location thereof, and to remove the same at pleasure,
as it may find needful or convenient in the transaction of
its business as manufacturers and dealers in lumber,
spirits and kindred commodities, but all such changes and
removals of spurs, laterals and switch tracks shall be
done in a skillful and workmanlike manner, and at such
times as will least interfere with the operation of the main
line road by the party of the second part. All of the said
above and feregoing work to be subject to the approval of
the party of the second part, or some suitable person to
represent him.

"4. Whereas, the party of the second part may not
begin to use said main line road for the operation of
trains until some time after the date of the signing of
this agreement; therefore in that event it is agreed that
until such time as the party of the second part shall be-
gin to use said main line road for the operation of trains
that the party of the first part shall, at its own cost,
maintain and keep said main line road, with its bridges,
culverts, etc., in as good repair as the same is now in,
ordinary wear excepted; but whenever the party of the

second part shall begin to use the said main line road for the operation of trains, then and thereafter the cost of repairing and maintaining the bed and track of said ·main line road, other than the cost of replacing the steel, shall be paid by the parties hereto in such proportion as the amounts of tonnage carried by each of the parties hereto over said main line road bear to the cost of maintaining and reparing the ·said road, provided however, that in either event the party of the first part shall not be bound to maintain or repair said main line road or any part or parts of it or pay any portion of the cost thereof after the party of the first part shall have discontinued the use thereof, but the party of the first part shall not discontinue the use of said main line road or any part thereof until after it has given the party of the second part at least six months notice of its purpose so to do. It being the intention that the party of the first part shall not pay the cost or any part of the cost of maintaining any part or parts of said main line road of which it has discontinued the use, in the manner provided.

"5. From the time the party of the second part begins to use said main line road for the operation of trains, and during the continuance of the use thereof by the party of the second part, all trains and train crews of the party of the first part shall be under the reasonable direction of the train dispatcher or other properly designated officer of the party of the second part, and the party of the second part, during said period, shall have the right to establish, and the party of the first part, its servants, and employees shall at all times, after due notice thereof, obey such reasonable rules and regulations for the movement of its trains as the party of the second part may make, provided however, that such order of the train dispatcher, or other properly designated officer, and such rules and regulations of the party of the second part shall not interfere with the ex-

peditious movement of the trains and commodities of the party of the first part. It being the intention that said orders, rules and regulations shall be of such character as to fairly and equitably conserve and facilitate the business of each of the parties hereto.

"6. The parties shall each, and at all times during their joint use of the said main line road, exercise such care in the selection of cars, engines and equipment, and in the employment and conduct of servants, and in the operation of trains as will cause as little injury to or delay upon said road as practicable.

"7. The party of the first part shall, as between it and the party of the second part, be liable for all negligent or tortious acts of its servants and employees in the use and operation of said main line road, and shall hold the party of the second part harmless therefrom, provided however, that the party of the first part shall not be liable for any injuries or damages that may arise from the errors or mistakes in the orders of the train dispatcher or other officer of the party of the second part, or from any improvident rules or regulations which the party of the second part may establish.

"The party of the second part shall, as between him and the party of the first part, be responsible for all negligent or tortious acts of his servants and employees in the use and operation of said main line road, and shall hold the party of the first part harmless.

"8. No interest shall be charged upon the deferred installments of the consideration to be paid by the party of the second part to the party of the first part, as above provided, so long as the party of the second part shall not use said main line road for the operation of trains, but after the party of the second part begins the use thereof for the operation of trains, said deferred installments of the consideration shall annually and until paid bear such proportion of four per centum per annum interest, as the tonnage carried by the party of the sec-

ond part over said main line bears to the aggregate a-
mount of tonnage carried by both of the parties hereto.

"9. For the purpose of ascertaining the amount of
said interest and the proportions of the expense of
maintenance, as above provided, there shall be in
January of each year, after party of the second part be-
gins to use said main line road for the operation of trains,
an annual accounting between the parties hereto of said
tonnage carried by the parties hereto, and each of said
matters shall be fully ascertained and paid at that time.

"10. Whenever the party of the second part has paid
the full amount of the consideration to the party of the
first part, as above provided, and has performed this
agreement in all other respects to be performed by him,
then the party of the first part shall convey said main
line road, sold hereby to the party of the second part,
proper instrument or instruments warranting the title
held by the party of the first part hereto, but in making
the said instrument or instruments, the party of the
first part shall only be bound to convey and warrant the
fee title to the right of way of said main line road
where it owns the fee title, and as to the remainder of
the right of way of said main line road it shall only be
bound to convey and warrant such easement or ease-
ments as it now has or may in the interim acquire.

"11. In event the party of the second part shall fail
to make payments to the party of the first part, as above
provided, or any of them punctually and upon the times
above limited strictly and literally, the said times of pay-
ments and each of them being the essence of this con-
tract, then and in any such event this contract shall be
null and void, and thereupon all rights and interest there-
by granted to or then existing in favor of the party of
the second part shall utterly cease and determine, and
the property hereby sold, together with all improvements
and betterments thereof shall immediately revert and in-
vest in the party of the first part, without any declaration

or forfeiture or act of re-entry and without any other act of the party of the first part to be performed, and without any right of the party of the second part or reclamation or compensation for moneys paid or improvements made hereunder or upon said property as absolutely and perfectly as if this contract had never been made.  It being the intention that said payments and improvements shall be held by the party of the first part absolutely as liquidated damages for the breach of this contract.

"12.  It is further agreed that the term 'party of the first part,' as hereinbefore used, shall apply to and include the successors and assigns of the Finkbine Lumber Company, and that the term, 'party of the second part,' as hereinbefore used, shall apply to and include the assigns, heirs and legal representatives of said Joseph T. Jones.

"Executed in duplicate this 8th day of May, A. D. 1909.
"FINKBINE LUMBER COMPANY,
    "By W. E. GUILD, Treas. and Gen. Mgr.
"JOSEPH T. JONES,
    "By J. A. JONES, Atty. in Fact."

In 1910 the Gulf & Ship Island Railroad Company was actively promoting immigration to and the settlement of South Mississippi.  On April 9, 1910, J. A. Jones, its vice president and the one who executed the above contract for his father, addressed a letter to the Finkbine Lumber Company which reads, in part, as follows: ·

"For a number of reasons it is not only desirable, but necessary for this company to promote the early settlement, by the farmers and others, of unoccupied tillable lands along its main line and branches in South Mississippi.

"The need exists to-day (and it will be of the utmost importance in a very few years) for an increase of traffic from soil products, to take the place of gradual diminishing of forest products, if this company's passenger and

freight train service is to be maintained at its present excellent standard.

"In connection with our traffic department, we have created an immigration bureau with agencies in other states, north and south. . . .

"While we do not anticipate an early or rapid movement of people to our part of the country, the thread of immigration to the South—small as yet—is begining, and if we can encourage these traffic producers to come and till the soil, and do other things of more or less commercial importance, the welfare of all the people owning land and other property in South Mississippi will be greatly enchanced during the next decade. . : .

"It is believed that if we can secure from landowners permission to offer for sale, at reasonable prices and terms, an aggregate of from one hundred and fifty to two hundred and fifty thousand acres nearest to our line, this fact properly advertised at our expense will sooner or later result in the development of South Mississippi to a marked degree, and all concerned will be benefited thereby.

"We therefore respectfully solicit your early and favorable consideration of this subject. . . .

" . . . What we desire is an opportunity to try what can be accomplished as the result of mutual active effort, which should be commenced at once."

In pursuance of this letter, there were personal interviews between representatives of the Finkbine Company and Mr. Jones, and the thing insisted upon by the Finkbine Company was some definite assurance that the logging road theretofore purchased by Capt. Jones would be operated as a common carrier. While Capt. Jones had executed a contract of purchase, there was no definite time fixed in the contract when the road would begin to be operated as a common carrier, and no time stipulated during which it should be maintained by Capt. Jones as

a common carrier. In November, 1910, in answer to this desire and demand of the Finkbine Company, J. A. Jones wrote Mr. W. E. Guild, treasurer of the Finkbine Company, the following letter:

"Dear Sir: I am very much puzzled as to what to do about the proposition that you made concerning the logging road running from Wiggins, and several conversations with Mr. Hale and Judge Neville do not seem to simplify the puzzle. It seems to me, however, that your people will risk apsolutely nothing in guaranteeing to the people who purchase your lands that a railroad will be operated over the present logging road, as you and you only, can be sure of the development to take place; in other words, if anybody knows, you know that there will be enough population settled along this road to justify operating it. And once this population and its consequent traffic is established, most assuredly, if you and your friends do not wish to run a railroad there will be no difficulty in finding those that do, if the G. & S. I. were to be so foolish as not to want this road itself.

"Mr. Hale suggests that we might enter into some contractual relations with you, agreeing to operate this road under certain conditions, the main condition being that a certain population or a certain amount of traffic was established or assured. If you care to come down tomorrow, Tuesday, and discuss this matter fully, we will be glad to meet you. Yours truly, J. A. Jones, First Vice President.

After a personal conference then between Mr. Guild and Mr. Jones on December 10, 1910, J. A. Jones addressed to the treasurer of the Finkbine Lumber Company this letter:

"Dear Sir: If your company expends considerable time and money in the development of the farming lands around Wiggens, Miss., and tributary to the Finkbine Lumber Company's logging road, Capt. J. T. Jones is willing to guarantee operation of a railroad over the

present tracks of the Finkbine Lumber Company's logging road for a period of three years after the logging operations cease, said road being about twenty-four miles in length; but he does not wish it understood that he will operate this road if at any time it does not pay its operating expenses for three years."

It is claimed by appellee, as complainant in the court below, that Mr. Guild then went to Des Moines, Iowa, and in conjunction with the other stockholders of the Finkbine Lumber Company organized a corporation with the necessary charter powers to colonize and promote the development of the Finkbine Lumber Company's land in south Mississippi. This accounts for the organization of Mississippi Farms Company, appellee herein, and this company was capitalized by having the Finkbine Lumber Company declare a dividend equal to the value of its principal real estate holdings, twenty-four thousand three hundred and sixty acres of land at a valuation of six dollars per acre. The Finbine Lumber Company thereupon conveyed these lands to the Farms Company in lieu of payment of dividend in money. Before the Farms Company began its actual development, Mr. Guild wrote Capt. Jones a long letter rehearsing the negotiations up to that point. This letter was written January 11, 1911, and appears to have been prompted by the untimely death of Mr. J. A. Jones on December 24, 1910. In this letter Capt. Jones is told, among other things:

"In order to do this, we would have to have some assurance that the line would be operated in order to have our maps made showing this railroad as being located on the plats. . . . After making this agreement we have gone ahead with our project and organized a company with one hundred and fifty thousand dollars paid-up capital to take over and market all of these lands to actual settlers to develop the land along the lines as we had talked over. . . . We would like very much, Captain, to have a time set whereby

our counsel and yours can meet in Gulfport and arrange all of the details and have the matter finally settled and disposed of. . . . We are developing a demonstration farm just south of Wiggins, along the G. & S. I. track, which will be a great advertising feature for this part of the country, and we propose having a man in charge who can deliver lectures, give information to settlers as to what to grow, how to grow it and when to grow it, as well as to have actual demonstration of this work going on in the field.''

On February 14, 1911, Capt. Jones wrote Mr. Guild and addressed him as the president of the Mississippi Farms Company, and in this letter he states in part:

''The farming proposition in Mississippi is an important one at this time, and the future possibilities are great, and this is the position we wish you to reach, for we certainly shall need it in our business to keep up the freights; otherwise, I fear that Mississippi laws will eat up our income and we will have nothing but dilapidated railroads left after the timber is cut off.''

After further negotiations, the parties finally met at Gulfport on March 6th and entered into the following contract March 9, 1911, known in this record as the ''operating contract.'' This contract is as follows:

''This agreement between Finkbine Lumber Company, hereinafter called party of the first part, and Joseph T. Jones, hereinafter called party of the second part, witnesseth:

''Whereas, the parties hereto did, on the 8th day of May, 1909, enter into a written contract whereby the party of the first part sold to the party of the second part its main line road from the town of Wiggins, Miss., to Tiger Branch, Miss., as in said contract specifically defined, and

''Whereas, no time was fixed in the said contract for the commencement of the operation of the said road by the party of the second part and it is now deemed advisable that a time therefor be fixed:

"Now therefore, in consideration of the premises and the further consideration of one dollar, each to the other in hand paid the receipt whereof is hereby acknowledged, the parties hereto do each covenant and agree; one with the other, as follows:

"That the party of the second part, by himself or assigns, shall, within six months after receiving written notice from the party of the first part of the discontinuance by it of the operation of the said main line road and upon the vacation of the road by the party of the first part, the party of the second part will, within said six months, equip, maintain and operate the said main line road from the town of Wiggins to Tiger Branch for a period of at least three years, and will, during said three years' period, run at least one train each way daily (Sunday excepted) carrying passengers, and will also furnish such facilities for the transportation of freight as the judgment of the party of the second part may require.

"It is further agreed between the parties hereto that, whereas, under the said contract of May 8, 1909, the party of the first part was not bound to maintain the road bed, ties and culverts, or any portion or portions thereof, after it should cease the use of the same, and

"Whereas, the party of the first part has ceased to use for the carrying of timber or lumber the east twelve miles of said main line road, and it is desirable that the same be maintained hereafter until such time as the party of the second part shall enter upon the operation of the entire main line road:

"Now therefore, in that respect, it is agreed between the parties hereto, that the party of the first part shall employ such labor and furnish such material as may be necessary to maintain the said twelve (12) miles of said main line road, and shall keep a strict account of all money expended for such labor and material, which

expenditures shall not in any event. exceed the average sum of two hundred and fifty dollars ($250) per month, unless specially authorized by the party of the second part; provided, however, that if the entire main line road shall be turned over by the party of the first part to the party of the second part on or before the end of the said two-year period, the party of the first part shall, from the end of the said two years' period until the said road is turned over to him, maintain the east twelve (12) miles of said main line road at its, the party of the first part, own expense. The party of the second part agrees that he will, monthly, upon the rendition by the party of the first part of an itemized statement therefor, repay to the party of the first part the said monthly sum and such additional sums as the party of the second part may specially authorize.

"It is further agreed that this contract shall not alter or affect in any respect any of the provisions of the said contract of May 8, 1909, except as above specifically stated.

"It is further agreed that the term, party of the first part, as hereinbefore used, shall apply to and include the successors and assigns of the Finkbine Lumber Company, and that the term, party of the second part, as hereinbefore used, shall apply to and include the assigns, heirs and legal representatives of the said Joseph T. Jones.

"Executed in duplicate this 8th day of March, A..D. 1911.

"Finkbine Lumber Company,

"By W. E. Guild, Treas. & Gen. Mgr.

"Joseph T. Jones."

It will be noted that this contract was executed by Capt. Jones for himself. On October 26, 1911, there was an additional or supplementary contract whereby an additional two miles of road were sold to Capt. Jones. This contract reads:

"This agreement, between Finkbine Lumber Company, 'party of the first part,' and Joseph T. Jones, 'party of the second part,' witnesseth:

"Whereas, the parties hereto did, on May 8, 1909, enter into a certain written contract whereby the party of the first part sold to the party of the second part, its main line road from the town of Wiggins, Miss., to Tiger Branch, Miss., and

"Whereas, on March 8, 1911, the parties hereto entered into a further written supplementary contract, fixing the time for the commencement of the operation of said road by the party of the second part and providing for the maintenance thereof, after the party of the first part should cease to use the same, and

"Whereas, the party of the first part is the owner of two (2) miles of logging road, not included in said contract, but connected with said main line road and extending from Tiger Branch southeasterly into section twenty-one (21), township three (3), range nine (9) west, whch it desires to sell to the party of the second part.

"Now, therefore, the parties hereto do covenant and agree each with the other, as follows:

"1. The party of the first part shall and does hereby sell to the party of the second part, the said two (2) miles of logging road, running from Tiger Branch southeasterly into section twenty-one (21), township three (3), range nine (9) west, for the sum of eighteen thousand, seven hundred and fifty dollars ($18,750), which sum shall be paid by the party of the second part to the party of the first part, as follows:

"Twelve hundred and fifty (1,250) dollars within one hundred and eighty days after the execution of this agreement.

"Twelve hundred and fifty (1,250) dollars on the 10th day of January, 1912, and

"Twelve hundred and fifty (1,250) dollars on the 10th day of January each year thereafter until said consideration is fully paid.

"2. It is further agreed that in all other respects than as to the amount and times of payment of the consideration this agreement shall be governed and controlled by the provisions of the said contracts first above referred to, to the same extent and as fully as if each of the provisions of said contracts (except as to the amount and times of payment of consideration) were herein written as a part hereof.

"Executed in duplicate this 26th day of October, A. D. 1911.

"FINKBINE LUMBER COMPANY.,

"By W. E. GUILD, Treas. & Gen. Mgr.

"JOSEPH T. JONES."

In the meantime the Farms Company was acquiring lands from other parties, expending large sums of money upon its demonstration farms and for general advertising purposes, and was establishing a third corporation known as the "American Pickling & Canning Company." It was also bringing immigrants along the line of its logging road and selling several thousand acres of its lands to settlers. It claims that it made large expenditures and improvements upon the faith of Capt. Jone's letters and the several contracts. This was the *status* of the parties when Capt. Jones, in September, 1913, addressed his letter to the Finkbine Lumber Company declining to make further payments upon the contract whereby he agreed to purchase the logging railroad. The Finkbine Lumber Company by its officials protested at the construction which Capt. Jones placed upon these agreements and insisted upon each of the contracts being executed as agreed upon. The interpretation which Capt. Jones placed upon the contracts and the protest and insistence of the Finkbine Company are fully shown by the correspondence.

This disagreement led to the filing of the bill of complaint in this cause by the Mississippi Farms Company. Prior to the institution of the suit, the Finkbine Lumber Company assigned in writing all its claims under and by virtue of the contracts to the appellee herein, which sues not only for damages alleged to have been sustained by it upon the faith of the contracts and of the assurance of Capt. Jones, both written and oral, but also sues as assignee of the original contracts. With this brief statement of the facts and issues presented by a very voluminous record of several volumes, I proceed to a statement of my views on the law points.

The original contract of May 8, 1909, involving twenty-four miles of the logging railroad, is either an option or a contract of purchase. In law it cannot be a combination of both, and there is in the legal sense no other kind of contract into which it may be construed. If it is a contract of purchase, it follows that Capt. Jones bought a logging railroad on the installment plan, and ought in equity and good conscience to pay for it. No amount of depression in business or disturbance of stock markets should excuse a purchaser from paying the balance of the consideration for that which he has solemnly agreed to buy. Was this, then, a purchase? That is what the contract itself says. Excerpts from the contract are as follows: First party "agrees to sell." Second party "agrees to pay to the party of the first part for said main line road the sum of two hundred and twenty-five thousand dollars." First party "reserves the right to use said main line road for the operation of its trains, etc., and also reserves the right "to make and maintain connections with said main line road by spurs, laterals and switch tracks." Another provision in the contract is that party of the first part "shall convey said main line road, sold hereby to the party of the second part, by proper

instrument or instruments warranting the title, etc."
In the additional contract purchasing two miles, it is
stated that the parties did on May 8, 1909, enter into
a contract "whereby the party of the first part sold to
the party of the second part its main line road." These
contracts conclusively show that the logging road was
sold by the Finkbine Company and purchased by Capt.
Jones. All that the Finkbine Company reserved was
the right to use the road for transportation of its logs
and lumber until the said company had completed its
cut of timber, and the right to connect its spur lines
of logging road and switch tracks. The contract pro-
vides for a method of prorating the maintenance cost or
upkeep. The original contract contemplated the use of
the road by Capt. Jones as a common carrier and
spoke of this day and provided certain contingencies,
as, for instance, "after the party of the second part
begins the use thereof for the operation of trains, said
deferred installments of the consideration shall annual-
ly and until paid bear such proportion of four per
cent. per annum interest as the tonnage carried by the
party of the second part" bears to the aggregate a-
mount of tonnage carried by both parties. The so-call-
ed "operating contract" states on its face that the first
party "sold to the party of the second part its main
line road."

It is contended for appellant that the three documents
or contracts constitute only one contract. It is imma-
terial whether they all relate largely to the same subject-
matter, or what nomenclature shall be applied. It was
evidently necessary for the parties to enter into each
of said contracts in order that their minds should fully
meet, and the contracts, of course, must speak for them-
selves. Certainly the original contract did not convey
the additional two miles of road, and certain it is that
the first contract did not fix any time for Capt. Jones
either to begin or to continue the operation of the road

as a °common carrier. Each of these contracts speak of a sale and designates the main agreement as a purchase and sale. There can be no question then about the essential nature of this contract. To avoid the irresistible legal consequences of any interpretation of the contract as a sale, one of the briefs on behalf of appellant views the contract as an option. From this it is argued that the contract "authorized Jones to withdraw" and at another point in the brief "Jones had a right, as a part of the contract itself, to cease his payments and withdraw." If the option premise is granted, then it would follow that Jones would have the option to accept or reject. The option theory finds no support in the language employed by the parties themselves. It is inconceivable that the parties would enter into such detailed provision for the joint use and upkeep of the road if this were an option. It would be absurd to talk about Capt. Jones operating a railroad which he did not own, and it is inconceivable that he would have entered into a contract to operate for three years a road which he had not elected to buy.

Clause 11, according to the majority decision, gave Capt. Jones the right to rescind, and a reversal of this case, and indeed final disposition of the suit, is based upon this clause. In my judgment, the language of this section of the contract nowhere authorizes Capt. Jones to break his own contract. To permit him to withdraw from the contract under the terms of this section, in my judgment, would permit him to take advantage of his own wrong, and the conclusion reached by the court gives judicial sanction to the breaking of a contract. The language of this clause nowhere says that Capt. Jones as the party of the second part may cease or refuse to make any of the deferred payments. The deferred payments are definitely agreed upon in the contract, and Jones "agrees to pay" them punctually at the time stipulated.

The contract does fix the punishment in case he failed
or refused to make any one of the payments promptly
upon the day it was due. I do not dissent from the hold-
ing stressed  in the opinion  of the court that time may be
made the essence of a contract and performance required
strictly and literally upon the day or days agreed upon.
If Capt. Jones had defaulted in any one of the payments
and after the day appointed had tendered his belated
payment, these provisions of clause 11 would, at the op-
tion of the vendor, the Finkbine Company, apply. These
provisions that default in the payment of any one of the
installments on the purchase price would render the
contract void mean, and should be interpreted to mean,
that the contract would be void at the option of the vend-
or. This, as I understand, is the unbroken line of authori-
ty everywhere. Mr. Black, in his recent work on Re-
scission and Cancellation, discusses the effect of fail-
ure or impossibility of performance, and in paragraph
215, among other things, says:

"Where the contract provides that, in case of default
in the payment of any installment, the agreement shall
be null and void, and the rights of the purchaser there-
under shall be forfeited, this provision is held to be for
the exclusive benefit of the vendor, and he is not bound
to terminate the contract on the vendee's default. He
has the option to do so, but he may, if he chooses, elect
to treat the contract as continuing and insist on the per-
formance according to its  terms"—citing  authorities
in the footnotes.

He also discusses contracts in which time is of the es-
sence, and states that in such cases "the other party,
not being himself in default, will thereupon have the
right to rescind the contract and treat it as at an end,"
paragraph 216. And again in paragraph 440:

"A  provision  in  a  contract  for  the  sale  of
land, where the price is to be paid in installments, that

default in the payment of any installment shall cause the contract to become void, or give the vendor the right to terminate it, is for his exclusive benefit and gives him an election either to forfeit the contract or to treat it as continuing in force and insist on its completion. But if he chooses to annul the contract on this ground, the rights of the vendee are at an end. But forfeitures are not at all favored, especially in equity, and a provision of this kind in a land contract will be construed strictly.''

And again:

''One who has a right to rescind a contract to which he is a party generally has a choice or option as to whether or not he will exercise that right, and his election cannot be controlled by the other party.'' Paragraph 441.

And in 29 Amer. & Eng. Encl. of Law (2d Ed.), p. 1070, is the following:

''It is not unusual to stipulate in contracts that they shall be 'void' under certain circumstances, and in view of the inaccurate use of the word 'void' heretofore referred to, it generally becomes necessary to ascertain the precise sense in which the word is used. The general rule is that, where such stipulations are inserted for the sole benefit of one of the parties, the word 'void' is to be construed as though the contract read 'voidable.' Thus, provisions in leases, that if the tenant shall not with due promptness perform his covenants to build, repair, insure, pay rent, and the like, the lease shall be 'void,' or 'utterly null and void, to all intents and purposes,' etc., are held to mean voidable at the instance of the lessor.''

This is the text law on the subject. Let us review some of the decisions. Our own court answered the question as early as 1844. In the case of *Beaty* v. *Harkey,* 2 Smedes & M. 563, is the following:

"The single question is: Did the vendee agree to purchase, and the vendor agree to sell? Is it a contract binding on poth parties? It surely could not be pretended that the vendee could not have coerced a specific performance, on payment of the purchase money; and, if that be true, then the vendor is entitled to his remedy at law; for all such contracts must have mutuality. The agreement is, in substance, that if the vendee should fail to pay the purchase money, then the contract of sale should be void. A stipulation in a contract, that in case the vendor cannot convey, or if the purchaser shall fail to pay on the appointed day, then the contract shall be void, does not enable either party to vacate the agreement, by failing to perform his part of it. Sugden on Vendors, 44. In such cases, the purchaser may avoid the contract, if the seller do not make a title, and the seller may avoid it, if the purchaser do not pay the money; but the purchaser cannot say, 'I will not pay,' and thereby avoid the contract. The default of one party confers on the other the right to rescind. Sugden on Vendors, 261."

In line with this holding is the decision in the case of *Holloway* v. *Moore,* 4 Smedes & M. 594. Equity does not favor a forfeiture and the statement of our court in the Holloway-Moore Case that, "If he [the vendee] fail to pay at the time stipulated, the vendors had a right to consider the contract at an end," was explained by our court in the case of *Walton et al.* v. *Wilson,* 30 Miss., 576, in which our court directed attention to the fact that under some circumstances even the vendor would not be permitted to rescind. It should be remembered, in this connection, that the present suit is not a suit to enforce a forfeiture. In the present case the vendor did not elect to rescind, but insisted upon the contract being executed. In such case equity will always lend its aid to enforce a specific performance for the purchase of real estate, in the absence of a showing that the vendor is himself in default or un-

able to tender or convey a good title. This, I understand, is the rule of the English Court of Chancery, the rule handed down to us as a part of our equity jurisprudence. In the case of *Wilcoxson* v. *Stitt*, 65 Cal. 596, 4 Pac. 629, 52 Am. Rep. 310, the holding of the court is clearly indicated by the headnote as follows:

"Where, in an agreement for the sale of land, the parties stipulate that, 'in event of the failure to comply with the terms of the agreement, the vendor shall be released from all obligation to convey and the vendee shall forfeit all right thereto, and the agreement shall be void,' the meaning of such clause is that such agreement is void only at the election of the vendor, who can avoid it or enforce it at his option."

The opinion discusses some of the older authorities which shed light upon this question. In *Eastman* v. *Wyatt Lumber Co.*, 102 Miss. 313, 59 So. 93, a provision in a contract of this kind provides:

"All lands, titles to which are not perfected by September 1, 1910, the second party is released from buying."

Our court held that this provision was intended for the benefit of the vendee and if he insisted upon performance he could waive the condition and insist upon the vendor's performance. The case of *Wills* v. *Manufacturers' Gas Co.*, 130 Pa. 222, 18 Atl. 721, 5 L. R. A. 603, presented for construction the following clause:

"And it is further understood and agreed that upon the failure of the party of the second part, its successors and assigns, to keep and perform all the covenants herein contained, such failure to perform, or breach of said covenant, shall work an absolute forfeiture of this grant or lease, and the privileges or easements hereby given shall absolutely cease, determine, and become null and void."

The court in construing this provision says:

"It is very plain that this clause of the contract was inserted in the interest and for the exclusive benefit of the lessor, whose purpose it was to have his lands developed for oil and gas."

And further said:

"It certainly was not in contemplation of the parties that the defendants might set up their own default as a cause for the cancellation.

"If this is so, this contract, drawn with exceptional care for the protection of the lessor, is a mere rope of sand; its obligations could only repeat the word of promise to the ear, to break it to the hope."

In *Stewart* v. *Griffith,* 217 U. S. 323, 30 Sup. Ct. 528, 54 L. Ed. 785, 19 Ann. Cas. 639, there was a stipulation as follows:

"In case the remainder of the first half of the purchase price be not paid on November 7, 1903, then the said five hundred dollars so paid to the said Griffith is to be forfeited and the contract of sale and conveyance to be null and void, and of no effect in law, otherwise to be and remain in full force."

The court construed this provision by saying:

"The condition plainly is for the benefit of the vendor and hardly less plainly for his benefit alone, except so far as it may have fixed a time when Stewart might have called for performance if he had chosen to do so, which he did not. This being so, the word 'void' means voidable at the vendor's election, and the condition may be insisted upon or waived at his choice."

But stress is laid on the opinion of the court upon what is contended to be unusual language in clause 11, as "without any declaration or forfeiture or act of reentry and without any other act to be performed by it," the vendor. I do not see how these words materially

add anything to the word "void." If a contract is void,
it is difficult for me to imagine how it could be more void.
A case almost identical with the contract here under
consideration is presented in *Rock Island Lumber Co.* v.
*Fairmount Town Co.,* 51 Kan. 394, 32 Pac. 1100. The
clause under construction there was as follows:

"And in case the party of the second part shall fail
to make the payments aforesaid punctually, and in ac-
cordance with the strict terms of this contract, and at the
times specified and limited, and to erect or cause to be
erected a building as above described and contracted, and
perform and complete all the stipulations and agree-
ments herein contained, literally and strictly, without
failure or default, then this contract, as far as it binds
the party of the first part, shall be determined, and be-
come utterly null and void, and the party of the second
part shall forfeit all payments made by him on this con-
tract, and all rights and interests hereby created in
favor of the second party shall entirely cease; and the
right of possession and all equitable and legal interests
in the premises hereby created, together with all im-
provements made, shall revert and revest in said party
of the first part, without any act [or acts] of re-entry,
or other act to be performed by the party of the first
part; the party of the second part forfeiting all rights to
the above premises, or claims for improvements made,
together with all moneys paid."

There was a default in the payment of the last install-
ment and a suit for the specific performance. The de-
fendant demurred to the bill, and in disposing of the de-
murrer the court said:

"It is next contended that the contract at the time this
suit was commenced had 'become utterly null and void,'
because the 'Rock Island Lumber and Manufacturing
Company' failed to pay its last installment. It is argued
that, as the lumber and manufacturing company was in

default, both parties were thereupon released from all the obligations of the contract, and that no action could be maintained on it; therefore, that a suit for specific performance could not be enforced at the instance of the town company. The law is well settled. The stipulations in the contract quoted were inserted for the benefit of the town company, the party of the first part, the seller of the lots described in the contract. The lumber and manufacturing company cannot take advantage of its own neglect in the non-payment of the purchase money. Under the contract the town company had the option to avoid or enforce its terms; therefore, it could, if it so elected, maintain this action to enforce the contract and recover the unpaid balance of the purchase money.''

It will be noted that the court in this case said "the law is well settled." It is difficult for me to conclude that law which is well settled in other states has never been heard of or applied in Mississippi. In *Ray* v. *Gas Co.*, 138 Pa. 576, 20 Atl. 1065, 12 L. R. A. 290, 21 Am. St. Rep. 922, the court declared the principle well settled, and observed:

"No case has been brought to our notice in which the lessee was allowed to take advantage of his own wrong, or to set up his own default to work a forfeiture of his own contract."

In *Chambers* v. *Anderson*, 51 Kan. 385, 32 Pac. 1098, the contract was almost identical with the language here employed, reading:

"In case the second party shall fail to make the payments aforesaid, and each of them, punctually, and upon the strict terms and times above limited, and likewise to perform and complete all and each of the . . . stipulations aforesaid, strictly and literally, without any failure or default, then this contract, so far as it may bind the said first party, shall become utterly null and void, and all rights and interests hereby created, or then existing

in favor of or derived from the first party, shall utterly cease and determine, and the rights of possession, and all equitable and legal interest in the premises hereby contracted, shall revert to and revest in the said first party, without any declaration of forfeiture or act of re-entry or any other act of said first party to be performed, and without any right of said second party of reclamation or compensation for moneys paid or services performed, as absolutely, fully, and perfectly as if this contract had never been made.''

The court cited to approve the older case of *Canfield* v. *Westcott*, 5 Cow. (N .Y.) 270, and there concluded that an agreement of this nature is void only at the election of the vendor. See, also, *Galey* v. *Kellerman*, 123 Pa. 491, 16 Atl. 474; *Agerter* v. *Vandergrift*, 138 Pa. 576, 21 Atl. 202; *Phillips* v. *Vandergrift*, 146 Pa. 357, 23 Atl. 347; *Bohart* v. *Investment Co.*, 49 Kan. 94, 30 Pac. 180.

But it is insisted that clause 11 provides for liquidated damages in event of the breach of the contract, and that, merely because the parties have in advance agreed upon the amount of damage, appellant has the option to break his contract and pay the sum stipulated. If the amount here agreed upon is to be regarded as a penalty instead of liquidated damages, the rule is unbroken that the presence of this provision for a penalty does not justify the party in refusing to perform. Mr. Pomeroy (paragraph 446) says:

''If the sum stipulated to be paid is really a penalty, the party will not be allowed to pay it and then treat such payment as a sufficient ground for refusing to perform the undertaking.''

If, however, the amount agreed upon in this case is liquidated damages instead of a penalty, then under the authority of a few cases equity will not decree a performance.

Perhaps the strongest case in support of appellant's contention on this point is that of *Davis* v. *Isenstein*, 257

Ill. 260, 100 N. E. 940, 45 L. R. A. (N. S.) 52.   It will
be noted, however, that in this Davis Case the contract
was to exchange lands, and it was agreed that one thous-
and, five hundred dollars should be deposited by each par-
ty in escrow as a guaranty of the faithful compliance with
the contract, and it was distinctly agreed that, upon the
failure of either party to perform, the stakeholder was to
turn over to the party willing to perform the amount of the
forfeit. The amount of this forfeit was agreed on as "fixed
and liquidated" damages. The particular contract there
under review was construed as an optional contract, and
either party had the alternative to perform or to forfeit.
This is an entirely different case from the one at bar.
As before stated, there is not a word in the contract in the
present case expressly saying that Capt. Jones has a
right to refuse to perform and thereby to forfeit what
he had paid.   It does visit the consequences of his fail-
ure upon him, but this is different from expressly declar-
ing that he shall have the option to perform or to forfeit.
The court in that case cited some of the cases relied upon
in the majority opinion, notably, from Illinois.   In the
case of *Kock* v. *Streuter,* 218 Ill. 546, 75 N. E. 1049, 2 L.
R. A. (N. S.) 210, cited, there was a contract for the
exchange of certain land, and the agreement was as fol-
lows.

"It is further agreed that, if either party hereto fails
to keep or perform the covenants hereinabove specified,
said party so defaulting shall forfeit to the other the
sum of one thousand dollars, the said sum being agreed
liquidated damages."

The court in that case cited Pomeroy and Fry on
Specific Performance and directed attention to the fact
that it is only where the contract stipulates for one of
two things in the alternative, that is, either the perform-
ance of the things agreed to be done, or the forfeit of an
agreed amount of money in lieu thereof, that equity will
not interfere.   The court then proceeds to announce:

"If these principles be applied to the contract in question we see no reason why a court of equity will not specifically enforce it. There is nothing in the terms of the contract which indicates that either party has the option or election to do the things provided for in the contract, or to pay the sum of one thousand dollars [provided for] as liquidated damages. The contract provides that the appellee agrees to sell and convey by warranty deed a farm, and the appellant, in consideration thereof, agrees to convey to appellee by warranty deed three hundred and forty-one and ninety-eight hundredths acres. . . . The provision in regard to the forfeiture of one thousand dollars as agreed liquidated damages was merely a security for the performance of the contract, and that there is nothing in the terms of the contract to justify the conclusion that either party had a right to perform the contract, or, in lieu thereof, to pay the sum of one thousand dollars."

This is exactly the same kind of case as the one before us. As it seems to me, the provision whereby the Finkbine Company was to retain all payments as liquidated damages was intended as a security for the performance of the contract, to make sure that Capt. Jones complied. From the significance attached to the strict lettering of clause 11 by the opinion of the court it would appear that the court is holding that, the stronger the language of the contract, the freer the purchaser to withdraw from it. The strict and binding language employed leads me to a conclusion exactly opposite; that is, that these words are employed to guarantee the faithful compliance by the purchaser. This case of *Kooh* v. *Streuter, supra,* is an Illinois case, and goes a long way to discount the holding in the other cases from Illinois cited in the majority opinion. But this is not the only reason why I do not regard the other Illinois cases referred to as authority for a reversal. For instance, the case of *Lyman* v. *Gedney,* 114 Ill. 388, 29 N. E. 282,

55 Am. Rep. 871, was another case for the exchange of real estate, and even in that case of exchange the supreme court affirmed a decree for specific performance. It would unduly prolong this opinion to criticize each of the decisions of the supreme court of Illinois on this subject. When properly understood and applied to the facts in each case, I seriously doubt whether they are in conflict with the views which I entertain. The true distinction seems to be stated by the supreme court of Illinois in the case of *Barrett* v. *Geisinger,* 179 Ill., 240, 53 N. E. 576, a case seeking to prevent disposition of certain property under a contract to make a will and to decree specific performance. The language of the court is as follows: "The question always is: What is the contract? Is it that one certain act shall be done, with a sum annexed, whether by way of penalty or damages, to secure the performance of this very act? Or is it that one of two things shall be done at the election of the party who is to perform the contract, namely, the performance of the act, or the payment of the sum of money? If the former, the fact of the penal or other like sum being annexed will not prevent the court enforcing performance of the very act, and thus carrying into execution the intention of the parties. If the latter, the contract is satisfied by the payment of a sum of money, and there is no ground for proceeding against the party having the election to compel the performance of the other alternative."

In the note to *Davis* v. *Isenstein, supra,* as reported in the L. R. A., is a reference to the case of *Hedrick* v. *Firke,* 169 Mich. 549, 135 N. W. 319, holding that a stipulation for liquidated damages in a contract for the sale of land will prevent a specific performance "only where it appears from the whole contract to have been the intention of the parties that the right to pay the stipulated sum or perform the contract should be optional." In *Donahoe* v. *Franks* (D. C.) 199 Fed. 262, it is held that the word "retained" could not be construed as meaning "accepted"

and that the vendor had a right to specific performance for the balance of the purchase price. In that case it was expressly agreed that payments on the purchase price in case of breach of the contract should be forfeited and "retained" as liquidated damages. In *Heckman's Estate,* 236 Pa. 193, 84 Atl. 689, cited in the majority opinion, the suit was by the vendee after he had failed to comply with his contract at the time stipulated. It was held that the language, "in case of forfeit, all rights under this agreement should be at an end," precluded his recovery. That is an entirely different case from the one now before us. It will be observed, I think, that the opinion in *Davis* v. *Isenstein* went further in its holding than any of the cases which it cited and relied upon.

In the case of *Hahn* v. *Concordia Society,* 42 Md. 460, referred to in the majority opinion, the contract under review was an obligation of actors to perform at a theatrical engagement, and there was an express agreement to pay two hundred dollars forfeit for the violation of the contract. The prayer was for an injunction and the case did not, of course, involve the sale of real estate. In the case of *St. Mary's Church* v. *Stockton,* 8 N. J. Eq. 520, it was doubtful whether the vendor could convey a good title, and the parties bound themselves one to the other in the sum of five thousand dollars for the performance of the covenants. There was really no decision of the point here under consideration. *Bodine* v. *Glading,* 21 Pa. 50, 59 Am. Dec. 749, involved the sale of real estate at auction and a written stipulation that:

"The cash is to be paid within fifteen days from the sale or the property may be resold at the risk and expense of the purchaser."

There were certain objections made to the title and, these objections were not cleared and removed for some time. The court declined to decree specific performance on the ground of lack of mutuality.

The operating contract sheds light upon the real intention of the parties. It certainly was never the intention of the parties that Capt. Jones had the option to withdraw in any of these contracts whether they are to be considered as one continuing contract or as separate obligations. The fact that Jones entered into a solemn obligation to operate the road for a period of three years shows that in any event the road was to become his property. There is nothing in this operating contract which expressly declares that payments forfeited by Capt. Jones on the consideration or purchase price of the first contract is to compensate the Finkbine Company for Jones' failure to operate the road. The operating contract does provide that it "shall not alter or affect in any respect any of the provisions of the said contract of May 8, 1909, except as above specifically stated." It left the original contract of purchase in full force and effect and neither added to nor took away the provision for liquidated damages. It was certainly not within the contemplation of the parties nor part of the agreement that clause 11 providing for liquidated damages should compensate for any damages for failure to operate the road as a common carrier. In the first contract there was no express agreement to operate at all, although the contract, of course, contemplated such use to be made of the property. Now, then, could the parties in May, 1909, agree upon liquidated damages for a contract which had not been entered into and which was not entered into until March, 1911? The provision then for liquidated damages has no effect whatever upon the contract of March, 1911, the so-called operating contract, and for the breach of this operating contract the Finkbine Lumber Company, or its assignee, has the undoubted right either to a specific performance or damages in lieu thereof. There is nothing in the language of this operating contract which makes its performance contingent upon whether Jones breaches or executes the original contract of purchase. It expressly provides

that, when the party of the first part vacates the said railroad, then Capt. Jones, as second party, "will within the said six months equip, maintain, and operate the said main line road," etc. This was the express, unqualified, unambiguous agreement. Under the opinion of the court Capt. Jones is now allowed to breach this operating contract simply and solely because he breached the first. This, in effect, makes one breach justify another. I concede that it would be impossible for Capt. Jones to operate for three years a railroad which he does not own, but this, in my judgment, goes far to show the propriety of the decree rendered by the learned chancery court decreeing specific performance of the contract of purchase. The court not only reverses the decree, but enters judgment here for the appellant. Certainly the complainant had either the right to a specific performance of the operating contract or to a recovery of damages for the breach thereof in lieu of specific performance. The mere retention by the Finkbine Company of the payments made on the purchase price as liquidated damages for the failure of Capt. Jones to finish paying for the property would not and could not compensate for the, failure to operate the road for three years. My attention has not been directed to any case where the court failed to decree specific performance for the sale of real estate, even though there is a provision for liquidated damages. There are some cases cited where the contract was for an exchange of lands and the forfeit or liquidated damages stipulated for was an agreed sum of money put up in advance or agreed to be paid. in advance separate from the consideration.

I confess I do not fully comprehend the attitude of the court in first holding that clause 11 authorizes Capt. Jones to withdraw from all three contracts, and therefore entitling him to a decree here in his favor, and then proceeding to hold that a specific performance of a contract

for the operation of a railroad cannot be had in Mississippi. I see no necessity also in the court, under its main view of the case, holding that the Mississippi Farms Company, not being a party to the contract, cannot recover anything in the way of damages. If clause 11 justifies Capt. Jones in withdrawing altogether, then the demurrer to the original bill should have been sustained and the cause dismissed. This would put an end to the case, and the court falls into an inconsistent position in discussing or deciding any other question in the case. For this reason I deem it unnecessary for me to discuss the legal rights of the Farms Company for any expenditures upon its own account or damages suffered by it other than as assignee. I have some views on the measure of damages in this case; but, since the case turns upon the one and only point of Jones' right to withdraw and forfeit his payments, it will avail nothing for me to discuss moot questions. The case is not to be remanded, and the question of the measure of damages presents an immaterial inquiry.

I am convinced that Capt. Jones beyond doubt bought a railroad, and, even though it would be the proverbial "white elephant" on his hands, he should be required to pay for it. To hold otherwise would be to allow him to take advantage of his own default, and, in the language of one of the cases above quoted from:

"This contract, drawn with exceptional care, . . . is a mere rope of sand; its obligations could only repeat the word of promise to the ear, to break it to the hope."