875 F.2d 516
 James P. KNIGHT, Jr., Plaintiff-Counter Defendant-Appellant,
v.
Rasool S. SHARIF, Defendant-Counterclaimant Cross-Claimant-Appellant,
v.
Earl C. WALSH, et al., Defendant-Cross Defendants-Appellees.
and
Edward P. Turner, Jr., David Michael Huggins and Harlon W.
Turner, Attorneys for Sharif, Appellees.
 No. 88-4620.
 United States Court of Appeals,
Fifth Circuit.
 June 19, 1989.
Rehearing Denied Aug. 1, 1989
Rehearing Denied Aug. 1, 1989.
 
 Edward P. Turner, Jr., Halron W. Turner, Turner, Onderdonk & Kimbrough, Chatom, Ala., for Sharif.
 Barry H. Powell, Jackson, Miss., for Turner, Huggins & Turner.
 James R. Mozingo, Thomas B. Alexander, Stennett, Wilkinson & Ward, Jackson, Miss., for Walsh.
 Martin R. Jelliffe, Richard M. Edmonson, Edmonson, Biggs & Jelliffe, Jackson, Miss., for Knight.
 Appeal from the United States District Court for the Southern District of Mississippi.
 Before GOLDBERG, JOHNSON, and DUHE, Circuit Judges.
 JOHNSON, Circuit Judge:
 
 
 1
 Appellant Rasool Sharif appeals an order of the United States magistrate granting summary judgment in favor of the shareholders of Green Acre Farms, Inc. (GAF) in a contract dispute evolving out of the attempted purchase by Sharif of all the issued and outstanding common stock of GAF. Further, counsel for the GAF shareholders, James Knight, appeals an order entered by the district court denying Knight's request for Rule 11 sanctions against Sharif after Sharif filed a counterclaim against Knight alleging tortious interference with contract. We now affirm the order of the magistrate on the merits of the contract dispute and affirm in part and vacate and remand in part the order of the district court denying the motion of Knight for Rule 11 sanctions against Sharif.
 
 I. CONTRACT DISPUTE
 
 2
 On April 19, 1986, Rasool Sharif and the shareholders of GAF entered into a letter of intent providing certain terms and conditions for the possible sale of all of the issued and outstanding common stock of GAF to Sharif. Several important issues regarding the sale of stock, however, were left unresolved between the parties by the April 19 letter of intent. Further, the April 19 letter provided for the preparation of a "final definitive agreement" within 30 days--May 19, 1986--which would be subject to the approval of counsel for both parties. Despite repeated negotiations, the parties had not yet reached a definitive agreement for the sale of the GAF stock as of the May 19 deadline. As a result, counsel for both parties negotiated a second letter of intent which was executed by the parties on May 19, 1986. Pursuant to the terms of the May 19 letter, Sharif placed in trust with counsel for the GAF shareholders, James Knight, approximately $250,000 to become earnest money in the event the parties executed a final agreement for the sale of the GAF stock on or before June 20, 1986. After numerous efforts by the parties to negotiate a definitive agreement for the sale of the GAF stock, the June 20 deadline expired without such an agreement for the sale of the stock having been executed by the parties. Nevertheless, Sharif thereafter demanded that the GAF stockholders sell the GAF stock to him in compliance with the terms of the April 19 and May 19 letter agreements executed by the parties. To support his demand, Sharif maintained that the April and May letters constituted a binding agreement between the parties for the sale of the GAF stock.
 
 
 3
 Anticipating a dispute between the parties, Knight commenced the instant interpleader action by depositing in federal district court the $250,000 previously tendered by Sharif as potential earnest money. The GAF shareholders and Sharif both subsequently filed answers in the interpleader action claiming the $250,000. Sharif also filed a cross-claim against the shareholders alleging breach of contract and tortious breach of contract. Additionally, Sharif filed a counterclaim against Knight alleging tortious interference with contract. Thereafter, by consent of the parties, the instant action was referred to a United States magistrate for trial on the merits. After the GAF shareholders filed a motion for summary judgment against Sharif, the magistrate issued a complete and thorough opinion granting summary judgment in favor of the GAF shareholders on the contract claim asserted by Sharif. Sharif now appeals that order. After reviewing the record, we affirm the order of the magistrate granting summary judgment in favor of the GAF shareholders for the reasons enunciated in the magistrate's opinion set forth below which adequately details why the April 19 and May 19 letters of intent do not constitute an enforceable contract between the parties for the sale of the GAF stock.
 
 II. RULE 11 SANCTIONS
 
 4
 Prior to the transfer of the instant interpleader action to a magistrate for trial on the merits, the federal district court initially responsible for this case entered a summary judgment in favor of Knight on the counterclaim filed by Sharif against Knight alleging tortious interference with contract. Thereafter, Knight filed with the district court a request for Rule 11 sanctions against Sharif on the basis of the tortious interference counterclaim, as well as on the basis of subsequent filings by Sharif in connection with that counterclaim. Those subsequent filings by Sharif for which Knight sought sanctions included: (1) a motion for leave to amend the tortious interference counterclaim, (2) a motion for continuance of the summary judgment motion filed by Knight, (3) a Rule 56(f) affidavit, and (4) a motion to vacate the order of the district court granting summary judgment in favor of Knight. The district court ultimately denied the motion by Knight for Rule 11 sanctions against Sharif. In doing so, the district court reasoned that it could not say that the tortious interference counterclaim filed by Sharif against Knight was not warranted by a good faith argument for the extension, modification or reversal of existing law, since no Mississippi case directly precluded the tort of contract interference by a client against an attorney based on the representation by that attorney of his client. Persuaded that the above decision by the district court to deny Knight's request for Rule 11 sanctions against Sharif on the basis of the tortious interference counterclaim did not constitute an abuse of discretion, we reject the claim of Knight in this regard.
 
 
 5
 As to the subsequent filings by Sharif for which Knight sought Rule 11 sanctions, however, we reach a different result. In Thomas v. Capital Security Services, 836 F.2d 866 (5th Cir.1988) (en banc), this Court stated that Rule 11 applies to each and every paper signed during the course of the proceedings, not just the initial filing in an action. Thomas, 836 F.2d at 875. In this regard, an attorney must comply with the affirmative duties imposed by Rule 11 as to each and every filing with the district court. In the instant case, the district court failed to set forth in its order denying Rule 11 sanctions against Sharif any reasons for denying such sanctions for the conduct of Sharif in filing with the district court the subsequent documents in connection with the tortious interference counterclaim against Knight. "[I]t should be clearly understood that when the basis and justification for a Rule 11 decision is not readily discernible on the record, an adequate explanation by the trial court for the decision will be necessary. In its absence, a prompt remand for such findings will be made." Id. at 883. In the instant appeal, such an adequate explanation by the district court as to the subsequent filings listed above is lacking; therefore, we remand for the limited purpose of allowing the district court to set forth reasons for its Rule 11 decision as to the subsequent filings by Sharif.[1]
 
 
 6
 For all of the above reasons, we affirm the order granting summary judgment in favor of the GAF shareholders on the merits of the contract dispute. We further affirm the order of the district court denying Knight's request for Rule 11 sanctions against Sharif on the basis of the tortious interference counterclaim; however, we vacate and remand that portion of the order of the district court denying Rule 11 sanctions as to the subsequent filings by Sharif in connection with the tortious interference counterclaim against Knight.
 
 
 7
 AFFIRMED IN PART, VACATED AND REMANDED IN PART.
 
 OPINION
 
 8
 The Court has before it for consideration a Motion for Summary Judgment by Defendants/Cross-Defendants, Earl C. Walsh, et al (hereinafter the "Shareholders"). For the reasons set forth hereinafter, the Court is of the opinion that Summary Judgment should be entered in favor of the Shareholders.
 
 
 9
 This case originated as an interpleader action filed by Jackson, Mississippi attorney James P. Knight, Jr. on July 3, 1986. Knight was a stakeholder of certain funds, $250,000.00 plus interest, which had been placed with him by agreement of the Shareholders and Rasool S. Sharif ("Sharif") pursuant to a letter agreement between them dated May 19, 1986. At the time of the escrow the parties were negotiating over the possible purchase by Sharif of all of the issued and outstanding common stock of Green Acre Farms, Inc. ("GAF") from the Shareholders collectively.
 
 
 10
 In response to Knight's interpleader the Shareholders answered making claim to the fund. Sharif answered making claim to the fund. Sharif also cross-claimed against the Shareholders alleging breach of contract and tortious breach of contract. Sharif also cross-claimed against one of the Shareholders, Dr. Earl C. Walsh, and counter-claimed against Knight for tortious interference with contract. Knight had acted as attorney for the Shareholders throughout the negotiations with Sharif. Summary judgment in favor of Knight was granted as to Sharif's counter-claim.
 
 
 11
 Subsequently, the SAAR Foundation, Inc. ("SAAR") was granted leave to intervene in this case. SAAR apparently loaned Sharif the $250,000.00 which he deposited in escrow with Knight pursuant to the May 19, 1986 letter. Of the $250,000.00 plus interest originally interpled, $200,000.00 has been paid over to SAAR with the consent of Sharif as a result of partial summary judgment granted earlier. SAAR's claim to the funds interpled is derivative of Sharif's claim thereto. SAAR makes no independent claim against any party.
 
 
 12
 In his claims against the Shareholders and Dr. Walsh, Sharif alleges that a final, binding contract for the purchase of the Shareholders' stock was entered into between himself and the Shareholders and that the Shareholders breached that agreement by failing to tender their stock, by failing to enter into the "final definitive agreement" tendered by Sharif and/or by failing to negotiate the final definitive agreement in good faith. There is also some argument in Sharif's Brief in Response to the Motion for Summary Judgment that the agreement was an agreement to negotiate in good faith rather than an agreement for the purchase and sale of stock. As to this latter issue, the Court finds that such a claim does not fall within the ambit of Sharif's pleadings. However, in the light of the Court's ruling it is unnecessary to reach this issue.
 
 
 13
 In response the Shareholders contend that no contract for the purchase and sale of stock existed between the parties. The Shareholders argue that the April 19, 1986 letter of intent between themselves and Sharif only memorialized preliminary negotiations and was not intended, nor ever understood, by either party to constitute a final, binding agreement for the sale of their GAF stock.
 
 
 14
 Alternatively, they argue that if there was any contract, it was merely one to negotiate, that they did so in good faith and were unable to reach agreement. Thus, according to the Shareholders, there was no breach of any contract to negotiate, even if one existed.
 
 
 15
 Dr. E.C. Walsh asserts that as a party to the negotiations and the alleged contract with Sharif, if such a contract existed, he could not, as a matter of law, interfere with his own contract. Alternatively, Walsh denies any such interference.
 
 FACTS
 
 16
 In March, 1986 Sharif contacted Dr. Walsh by telephone about the possibility of purchasing GAF. After the phone call, Sharif visited GAF in Sebastapol, Mississippi. Sharif was subsequently told that any purchase would have to be of the Shareholder's stock and not of the GAF assets.
 
 
 17
 After these limited contacts Sharif and the Shareholders entered into a letter of intent on April 19, 1986. (Addendum "A"). The letter of intent set certain conditions for the possible sale of the GAF stock. The letter of intent described for consideration numerous issues important to a sale of stock. Some of these issues were the representations and warranties to be made by each party to the other; the duration of each parties representations and warranties; the dollar amount of the indemnities of each party; the interplay of the indemnities with the nature and extent of the representations and warranties; the securities laws protections to be provided by Sharif to the Shareholders if Sharif subsequently sold the stock and numerous matters involving the implementation of the various provisions of the letter.
 
 
 18
 Additionally, the April 19 letter specifically provided for the preparation of a "final definitive agreement" within thirty (30) days of April 19, 1986. This final definitive agreement was subject in all respects to the approval of counsel for the parties. The purchase price of the stock was not finally fixed, and the Shareholders were expressly permitted to keep the stock on the market and negotiate with and sell to other buyers, subject to Sharif's right to match or better any offer.
 
 
 19
 Shortly before the May 19 deadline to reach a final definitive agreement, Knight was contacted by a new attorney for Sharif, Ed Turner of Chatom, Alabama. Turner sought a thirty (30) day extension of the May 19 deadline. Knight went to Mobile, Alabama on May 19, discussed the matter with Turner and on behalf of the Shareholders executed a second letter. (the "May 19 letter"). (Addendum "B").
 
 
 20
 By the terms of the May 19 letter, Sharif placed $250,000.00 in trust with Knight with the $250,000.00 to become earnest money in the event the final definitive agreement contemplated by the letter of intent was executed by the parties on or before June 20, 1986. In the event a final definitive agreement was not executed on or before June 20, 1986 the Shareholders were to retain $50,000.00 plus accrued interest for expenses incurred. Additionally, the Shareholders agreed that no further dividends would be declared by GAF and the GAF stock would be removed from the market pending the final definitive agreement.
 
 
 21
 Thereafter, Knight and special securities' counsel wrote to and communicated by telephone with Sharif and Turner. The Shareholders' attorneys sought information from Sharif as to his intentions with the stock and how he intended to finance the sale. They also sought personal information from Sharif. All of these matters were important to fashioning the securities protections for the selling Shareholders. Sharif refused or failed to provide this information.
 
 
 22
 The last day to reach a final definitive agreement fell on Friday, June 20, 1986. Prior to that week, June 16-20, Knight had sent Turner two (2) different drafts of a proposed final definitive agreement. These drafts were sent on June 4 and June 13. Knight received no response to these drafts until Thursday, June 19, the eve of the expiration of the thirty (30) day extension described in the May 19 letter.
 
 
 23
 Sharif's June 19 draft materially changed the structure previously proposed by Knight and was Knight's first notice that Sharif had any objection to the structure proposed by the Shareholders. Negotiations between the parties' attorneys ensued throughout the day of June 19.
 
 
 24
 On June 20 Knight tendered a revised draft of the final definitive agreement, which, among other things, provided for a $2,000,000.00 indemnity of the Shareholders' warranties and representations to Sharif to be provided by Dr. E.C. Walsh and his brother and fellow shareholder Ron Walsh. The indemnity was to be of a one (1) year duration. Knight informed Sharif's representatives that his draft of the final definitive agreement had been approved by the Shareholders.
 
 
 25
 Late on the afternoon of June 20 Turner and Sharif's local counsel, John Gourlay, met with Knight in Knight's office. As of the time of this final meeting between the lawyers there remained numerous differences between the Sharif draft of the final definitive agreement and the Shareholders' last draft. Sharif's draft provided that the warranties and representations of the Shareholders were to survive forever; provided that the Shareholders' indemnity of Sharif would be unlimited in both amount and duration; provided that the Shareholders would release all claims against the corporation despite some Shareholders being owed money by the corporation, $187,000.00 in the case of Dr. Walsh; did not provide assurance that the Shareholders who had personally guaranteed corporate debts would receive satisfactory releases, or releases at all, of those guarantees; did not provide that as of closing Sharif would acknowledge he had had access to and inspected everything about GAF he wanted to inspect; did not include a provision for an opinion of counsel for Sharif that if he resold the stock that he was in compliance with Federal and state securities' laws, a matter deemed extremely important by counsel for the Shareholders on the securities issues; and did not include a provision allowing Dr. Walsh an option to purchase certain farm equipment he wished to acquire from GAF.
 
 
 26
 According to Sharif's attorney, Gourlay, at the time of the final meeting with Jim Knight late on the afternoon of June 20, the only issue holding up the execution of the final definitive agreement, as far as Sharif was concerned, was an increase in the amount of the indemnity from the Walsh brothers. According to Gourlay, Sharif was willing to accept all of the other provisions of the Shareholders' final draft.
 
 
 27
 In his deposition, Gourlay states:"[W]hat I am telling you is that they [Sharif and his lender, SAAR] were prepared to take that document [Knight's final draft of June 20] if an acceptable indemnification could have been secured. I do not remember telling that to Jim Knight, because I deemed it moot when we couldn't change the one point that the lender was greatly concerned with."
 
 
 28
 When Gourlay and Turner met with Knight the only issue discussed was whether or not the Walsh brothers would agree to increase the indemnity. There was no mention by Turner or Gourlay that the other issues could all be resolved as the Shareholders wanted if the indemnity could be resolved. Gourlay states, "We kind of put the chicken ahead of the egg."
 
 
 29
 Knight contacted Dr. Walsh, who acted as principal representative for the thirty-five (35) shareholders during the negotiations, about increasing the amount of the indemnity. In this context, i.e. with the other issues remaining unresolved, Walsh would not agree to an increase in the indemnity. Knight reported Dr. Walsh's position to Gourlay and Turner and told them he would be at his office until the end of the day with the signed agreement.
 
 
 30
 Without further discussion Turner and Gourlay left Knight's office and reported back to Sharif and SAAR's representative, Jamal Al-Barzinji, that the Shareholders would not agree to increase the indemnity. Thereafter, in the presence of Gourlay, Turner and Barzinji, Sharif expressed his desire to execute the Shareholders' last draft and sought to have Barzinji agree to provide the financing. Barzinji refused and left town. Sharif did not execute the agreement and let the deadline expire without further discussion or negotiation.
 
 
 31
 On June 23, 1986, Gourlay, on Sharif's behalf, demanded in writing that the Shareholders close the sale based upon the April 19 letter of intent. Gourlay states in his deposition that such a procedure would have provided less protection for Sharif than he would have had under the Shareholders' last draft. The Shareholders refused Sharif's demand essentially on the basis that the April 19 letter was not a final, binding contract to sell their stock, that no final definitive agreement, as required, had been reached and June 20 had come and gone.
 
 DISCUSSION
 
 32
 In reviewing a motion for summary judgment, a Court must determine if there are any genuine issues of fact material to the resolution of the case in dispute, and, if not, whether under the undisputed facts the moving party is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56. In this regard the "mere existence of some alleged factual dispute" will not defeat an otherwise proper summary judgment motion. The factual dispute must be both genuine and material. "If the evidence is merely colorable, (citation omitted), or is not significantly probative, (citation omitted), summary judgment may be granted." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The Anderson Court further emphasized that "the mere existence of a scintilla of evidence in support of plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." Id. 106 S.Ct. at 2512.
 
 
 33
 The foregoing statements of law are particularly important in this case. In response to the Shareholders' summary judgment motion Sharif filed a response that was clearly inadequate. Local Rule 8(d) requires a response to not only state with specificity what facts are contested, but also the reasons therefor. While Sharif's response lists numerous facts as contested, no reasons are stated therefor nor is any support for the contest provided.
 
 
 34
 Fed.R.Civ.P. 56(e) requires a response to "set forth specific facts showing there is a genuine issue for trial." Nicholas Acoustics & Specialty Co. v. H. & M. Const. Co., Inc., 695 F.2d 839 (5th Cir.1983). Once the Shareholders filed their properly supported summary judgment motion, the burden of establishing that there were genuine issues of material fact which required trial was placed squarely on Sharif. C.F. Dahlberg & Co., Inc. v. Chevron USA, Inc., 836 F.2d 915 (5th Cir.1988); Golden Oil Co. v. Exxon Co., USA, 543 F.2d 548 (5th Cir.1976); Gossett v. Du-Ra-Kel Corp., 569 F.2d 869 (5th Cir.1978). Sharif failed to meet that burden.
 
 
 35
 To prove whether a contract existed, Sharif asked the Court to look at the April 19 letter of intent, the May 19 letter and language contained in powers of attorney executed by the Shareholders in favor of their negotiation representatives. Based upon these three documents (or sets of documents) Sharif argues that an enforceable contract was created.
 
 
 36
 While Sharif argues vociferously, he submits no additional facts, nor does Sharif provide a plausible interpretation of the letters in the context of this case. The totality of the facts must be examined and Sharif's claim appraised within this factual context. Matsushita Elec. Indus. Co. v. Zenith Radio, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (the factual context of a party's claim may render it implausible and require the party opposing summary judgment to offer more persuasive evidence to support his claim than might otherwise be necessary).
 
 
 37
 The Shareholders, in their motion, have put before the Court a full and adequately supported chronology of the facts which are undisputed in this case. Sharif presents no reasons for contesting these facts or any factual support for such a contest. The statements of undisputed fact set forth in the Shareholders' motion are therefore accepted and adopted. (See e.g. Taylor v. Kay Lease Service, Inc., 761 F.2d 1107, Ftn. 5 (5th Cir.1985)).
 
 
 38
 It is particularly interesting that Sharif did not submit an affidavit claiming he intended to be bound by the April 19 or May 19 letters. In fact, affidavits from both Sharif and another principal actor, his attorney, Ed Turner, were noticeably absent from Sharif's response to the Shareholders' motion.
 
 
 39
 A review of the April 19 and May 19 letters, (the powers of attorney make no contribution), clearly indicate that the parties manifested in writing an intent not to be bound until or unless a final definitive agreement was executed. There is no other realistic construction of the two letters when construed together. Moreover, there is absolutely no reason or purpose for the May 19 letter if a final definitive agreement was not necessary before the parties achieved a binding contract. The May 19 letter illustrates the parties' intentions on its face.
 
 
 40
 As stated by Sharif in his brief, under Mississippi law, which is applicable to this case, the test for determining whether a writing constitutes an enforceable contract is whether the parties have manifested an intention to be bound by its terms and whether the terms are sufficiently definite to be legally enforced. Jones v. Mississippi Farms Co., 116 Miss. 295, 76 So. 880 (1917); Mid-Continent Tel. Corp. v. Home Telephone Co., 319 F.Supp. 1176 (N.D.Miss.1970).
 
 
 41
 In Mid-Continent Judge Keady set forth eight (8) factors to be considered in determining whether or not parties intended to be bound by various agreements or writings: 1) whether the contract is one usually put in writing; 2) whether there are many or few details; 3) whether the amount involved is large or small; 4) whether a formal writing is required to fully express the promises and covenants of the parties; 5) whether the negotiations themselves indicate that a written draft is contemplated as a final conclusion of negotiations; 6) whether the explicit language used by the parties indicates their intent; 7) whether there was anything left to negotiate; and 8) whether there has been partial performance under the contract.
 
 
 42
 In a case substantially similar to the present one, J. Russell Flowers, Inc. v. Itel Corp., 495 F.Supp. 88 (N.D.Miss.1980), Judge Orma Smith utilized Judge Keady's Mid-Continent factors in determining that a letter of intent was not enforceable as a contract. In that case Judge Smith pointed out that "the material facts relating to the process of negotiations between the parties and the relevant correspondence is undisputed." Id. at 90. The same is true in this case.
 
 
 43
 In Flowers the Court observed that:"the crucial question ... is the legal conclusion which the Court must draw from the facts.... The question of whether or not a writing is to be given effect as a contract is one for the Court to ascertain from the surrounding circumstances ... consistent with recognized legal principles." Id.
 
 
 44
 The Flowers Court considered the express language used by the parties in the letter of intent. The letter of intent did not indicate that all material provisions of the contract had been agreed upon; various matters were left for future settlement. The amount of the financing involved was quite large; there were relatively few details in the letter. Of particular concern was that the letter of intent itself contemplated a formal document. The Court concluded that the transaction was incomplete, and that "even if [the letter of intent] was a preliminary agreement or 'contract to make a contract', [it] cannot be given legal effect." 495 F.Supp. at 92.
 
 
 45
 The present case is remarkably similar. The GAF transaction involved the purchase of 947,760 shares of stock from thirty-five (35) different sellers for a price of $11,373,120.00. A review of the various drafts of the final definitive agreement clearly shows the complexity of the transaction. Complex transactions involving substantial sums are virtually always put into a detailed, formal writing. R.G. Group, Inc. v. Horn & Hardart Co., 751 F.2d 69 (2d Cir.1984).
 
 
 46
 Continual redrafting of the specific terms of a proposed agreement, as here, is a clear indicator of the importance of the provisions and the parties' intention to be bound only by the final execution and consummation of the agreement. Winston v. Mediafare Entertainment Corp., 777 F.2d 78, 82-3 (2d Cir.1986).
 
 
 47
 The language of the April 19 and May 19 letters clearly contemplates further negotiations, and, as in Flowers, clearly shows the parties intended there to be a final definitive agreement before they were bound. The parties subsequent conduct is entirely consistent with the language of the two letters and sheds further light on their intent.
 
 
 48
 The Winston Court made a very salient observation in this regard and concerning the potential tyranny of courts in forcing contracts upon parties which they were not willing to make for themselves.
 
 
 49
 Parties that wish to be bound only upon execution of a formal document agree to negotiate in that manner [i.e. constant redrafting] because they wish to create a writing that is satisfactory to both sides in every respect. It is not for the Court to determine retrospectively that at some point in the evolution of a formal document that the changes being discussed became so "minor" or "technical" that the contract was binding despite the parties' unwillingness to have it executed and delivered. For the Court to do so would deprive the parties of their right to enter into only the exact contract they desired. Id. at 83.
 
 
 50
 (Accord: Reprosystem, B.V. v. SCM Corporation, 727 F.2d 257 (2d Cir.1984); Chromalloy American Corp. v. Universal Housing Systems of America, Inc., 495 F.Supp. 544 (S.D.N.Y.1980)).
 
 
 51
 Numerous material issues were left open by the parties for future negotiation: each party's representations and warranties, their duration, the amount and duration of the indemnities between the parties, the securities law protections, and the matters set forth above which were still at issue when the last meeting took place in Knight's office on June 20, 1986. All of these items were material to the risks and benefits of each party in a complex transaction. An acquisition of stock is a much more complicated transaction than an asset acquisition. "In an asset acquisition, as opposed to a stock acquisition, the parameters of potential liability are limited since it is plain what assets and related liabilities are being assumed." Rand-Whitney Packaging Corp. v. Robertson Group, Inc., 651 F.Supp. 520, 534 (D.Mass.1986).
 
 
 52
 Conditions of final approval, satisfaction of the parties or approval of counsel, as required in the letter of intent, are also strongly persuasive that the parties are not to be bound by the initial letter of intent. Betty Lee Shoes, Inc. v. Karl's Shoe Stores, Ltd., 293 F.2d 429 (5th Cir.1961).
 
 
 53
 The parties' use of the term "final definitive agreement" also leads to the distinct conclusion that what came before, the letter of intent, was neither final nor definitive. This is borne out by the definition of "definitive": "That which finally and completely ends and settles a controversy." Likewise the definitional antithesis of "definitive" is "not final or complete"; "left open and unsettled." Black's Law Dictionary, (4th Ed.1951).
 
 
 54
 Also, there is no evidence in the record of partial performance of the alleged contract.
 
 
 55
 In Etheridge v. Ramzy, 276 So.2d 451 (Miss.1973), the Mississippi Supreme Court found a letter of intent dealing with the purchase and sale of corporate stock to be unenforceable because it was too indefinite and uncertain. Moreover, contracts to make a contract are not enforceable unless the final agreement is to be a "mere memorial of the agreement already reached." Id. at 454. (See also: 1A Corbin, Contracts, Sec. 29 (1963).) The Court stated:
 
 
 56
 In order for a writing to be enforceable as a contract, agreement must be expressed on all essential terms. If the document or contract that the parties agree to make is to contain any material term that is not already agreed on, no contract has yet been made; and the so-called contract to make a contract is not a contract at all.
 
 
 57
 276 So.2d at 454.
 
 
 58
 Likewise, where a preliminary agreement leaves open any material term to be agreed upon in the final contract, "there can be no implication of what the parties will agree upon." South Mississippi Elec. Pwr. Assn. v. Delhi Gas Pipeline Corp., 436 F.Supp. 244, 257 (S.D.Miss.1977).
 
 
 59
 The Court concludes that the evidence is manifest, overwhelming and uncontested that the parties did not intend to be bound by the April 19 letter of intent, as modified and explained by the May 19 letter. The importance of the parties' expression of an intent not to be bound is manifest. "If either party communicates an intent not to be bound until he achieves a fully executed document, no amount of oral agreement to specific terms will result in the formation of a binding contract." Winston, supra, at 80. (See also: R.G. Group, supra, at 74-5.) Courts should not frustrate the parties' expressed intent. In addition, the letter of intent is not sufficiently definite to be legally enforceable.
 
 
 60
 As to Sharif's argument that a contract to negotiate existed, Mississippi, as illustrated by the foregoing cases, has never recognized contracts to negotiate nor contracts to make a contract. Sharif has submitted no Mississippi authority to the contrary.
 
 
 61
 Even if a contract to negotiate were found to exist, it is manifest that the Shareholders proceeded in good faith and in pursuance of their legitimate interests. Even assuming a contract to negotiate with Sharif existed, the Shareholders would not be required to actually enter into a contract with Sharif. An agreement to negotiate, even if recognized, does not bind a party to surrender his right to decide not to enter into another contract with the other party. Candid Productions, Inc. v. Intl. Skating Union, 530 F.Supp. 1330, 1337 (S.D.N.Y.1982).
 
 
 62
 Furthermore, Sharif has failed to raise any factual basis to support his assertion that the Shareholders breached their alleged contract to negotiate by dealing in bad faith. Sharif essentially alleges that the Shareholders exhibited their bad faith by their insistence on the expiration of the warranties and representations at closing and by Dr. Walsh's insistence on a right to purchase certain farm equipment not mentioned in the letter of intent. Such assertions fall on deaf ears where Sharif's own attorney, Gourlay, candidly admits that these matters were not barriers to the deal on June 20, 1986, that only the issue of the amount of the indemnification remained. Interestingly, Sharif does not complain about the amount of the indemnity, the only issue barring his agreement on June 20. Also, both Gourlay and Barzinji state without refutation that Sharif wanted to accept the Shareholders' final draft but that SAAR would not fund the purchase. Sharif's claim in this regard is knowingly without basis in fact.
 
 
 63
 Though it falls with the finding that no contract existed, Sharif's claim against Dr. E.C. Walsh individually is also clearly without basis, merit or support. A party to a contract cannot be charged with interfering with his own contract. Martin v. Texaco, Inc., 304 F.Supp. 498 (S.D.Miss.1969); Liston v. Home Insurance Co., 659 F.Supp. 276 (S.D.Miss.1986); Moreno v. Marbil Productions, Inc., et al, 296 F.2d 543 (2d Cir.1961); Olympic Fish Products, Inc. v. Lloyd, 93 Wash.2d 596, 611 P.2d 737 (1980); Prosser, Law of Torts, Sec. 129 at 934 (4th Ed.1971); Restatement (Second) of Torts, Sec. 766 (1979).
 
 
 64
 There are no genuine issues of material fact presented here. As a matter of law no contract existed between the parties. Even if a contract to negotiate was deemed to have existed, which it did not, the Shareholders would not have been in breach of it. When the requirements of Rule 56 are met, as here, summary judgment should be viewed with favor and applied according to its terms. Celotex Corp. v. Catrett, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); 10 Wright, Miller & Kane, Federal Practice and Procedure: Civil 2d, Sec. 2712 at 590 (1983). Thus, the Shareholders and Dr. E.C. Walsh individually are granted summary judgment as to the cross-claim of Rasool Sharif.
 
 
 65
 The Court further finds that pursuant to the terms of the May 19 letter, the Shareholders were to receive $50,000.00 of the money deposited by Sharif into escrow, plus accrued interest, if the parties failed to execute a final definitive agreement on or before June 20, 1986. This was obviously a term bargained for between the parties and an inducement for the Shareholders to incur the expense of further negotiations. The Shareholders were to take their stock off the market for thirty (30) days, and no corporate dividends were to be declared. The Shareholders met these requirements and are therefore entitled to the liquidated amount of $50,000.00 plus interest. The parties intended to be bound by this provision if they did not enter into a contract, i.e. the final definitive agreement. There is no evidence in this record of any bad faith on the Shareholders' part which might vitiate the parties' agreement on this issue.
 
 
 66
 Thus, the Shareholders are also granted summary judgment on the interpleader. The Shareholders are entitled to the remaining interpleaded funds on deposit with the Clerk, including all accrued interest thereon.
 
 
 67
 This opinion constitutes the findings of fact and conclusions of law of the Court. The attorneys for the Shareholders shall submit a final judgment consistent herewith within five (5) days.
 
 
 68
 THIS the 8th day of July, 1988.
 
 
 69
 /s/Britt Singletary
 
 BRITT SINGLETARY
 UNITED STATES MAGISTRATE
 
 
 [1]
 As to the subsequent filings and the propriety of Rule 11 sanctions for those filings, it is noted that, in its order granting a summary judgment in favor of Knight on the tortious interference counterclaim of Sharif, the district court characterized Sharif's subsequent motion to amend his counterclaim as untimely and without substance. The above conclusion appears to be inconsistent with the decision of the district court to deny Knight's request for Rule 11 sanctions against Sharif