KING, PRESIDING JUSTICE, DISSENTING:
 

 ¶100. Because I would find that sufficient evidence existed to support a jury question regarding whether Louisiana Hospice Corporation (LHC) and Gulf Coast Hospice formed an enforceable contract through words, actions, and performance of the parties, I respectfully dissent.
 

 ¶101. This Court reviews the grant or denial of a motion for summary judgment de novo and views the evidence "in the light most favorable to the party opposing the motion."
 
 Estate of Hudson v. Yazoo City, Miss.
 
 ,
 
 246 So. 3d 872
 
 , 876 (Miss. 2018) (citing
 
 City of Magee v. Jones
 
 ,
 
 161 So. 3d 1047
 
 , 1049 (Miss. 2015) ). Summary
 judgment is appropriate only "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact ...." M.R.C.P. 56(c).
 

 ¶102. Gulf Coast Hospice asserted that it is entitled to relief under the doctrines of equitable estoppel, promissory estoppel, and detrimental reliance. "A party asserting equitable estoppel must show (1) that he has changed his position in reliance upon the conduct of another and (2) that he has suffered detriment caused by his change of his position in reliance upon such conduct."
 
 PMZ Oil Co. v. Lucroy
 
 ,
 
 449 So. 2d 201
 
 , 206 (Miss. 1984) (citing
 
 Birmingham v. Conger
 
 ,
 
 222 So.2d 388
 
 , 392-393 (Miss. 1969). Equitable estoppel "has its roots in the morals and ethics of our society."
 

 Id.
 

 ¶103. I would find that Gulf Coast Hospice presented sufficient evidence to create a question of fact regarding whether LHC's conduct induced Gulf Coast Hospice to change its position and whether Gulf Coast Hospice suffered detriment in reliance upon that conduct. The record shows that in December 2010, LHC and Gulf Coast Hospice executed a Letter of Intent (LOI) in which LHC stated it intended to pay $ 1,750,000 for the acquisition of Gulf Coast Hospice. The closing was set to occur on February 28, 2011, with a target effective date of March 1, 2011.
 

 ¶104. On January 7, 2011, LHC sent Gulf Coast Hospice the proposed Asset Purchase Agreement, which contained the terms of the agreement reached by the parties. Outside of the addition of a bonus for Linda Rogers, the documents reflected the agreement of the parties, subject to the completion of due diligence by LHC. The same day, LHC also sent a change-of-ownership notification to the Mississippi State Department of Health's Health Facilities, Licensure, and Certification Division, stating it was a "formal notification that effective March 1, 2011, [LHC] will be purchasing" Gulf Coast Hospice.
 

 ¶105. On February 1, 2011, LHC's head managers announced to the staff of Gulf Coast Hospice that LHC intended to acquire Gulf Coast Hospice on March 1. LHC began discussing with Gulf Coast Hospice staff members which employees would be retained and which employees would be fired. LHC ran background checks on the employees and discussed which employees would have reduced salaries and mileage cuts and which employees would have to be dropped down to part-time hours. As a result, the majority of Gulf Coast Hospice's employees resigned. Rogers stated that she advised LHC not to adjust the employees' pay scales, because the employees had been loyal with their current salaries.
 

 ¶106. Moreover, after the announcement, LHC gained access to and copied patient charts. LHC replaced Gulf Coast Hospice's telephone system and changed its telephone providers. LHC replaced the computers, had new computer systems installed, and took over the computer network. LHC hooked the computers up to their nationwide network system, set up email accounts for all of the employees, and issued name tags to the employees. LHC contacted Medline, a medical products distributor, and changed the contract to LHC's name. Additionally, LHC changed the pest control contract, scheduled the utility services to change on March 1, installed photocopiers and fax machines, and changed the phone numbers to switch to LHC ownership. LHC even changed the wiring in the building. Harry Desai stated that LHC already had begun acting as if it had bought Gulf Coast Hospice.
 

 ¶107. On February 21, 2011, LHC sent an email to Gulf Coast Hospice stating, "[i]n anticipation of next week's closing of the transaction, please find attached the Wire Transfer Request Form and the Seller's W-9 Form." Gulf Coast Hospice completed and returned the forms to LHC. On February 22, six days before the closing, LHC sent a draft of the closing statement for the purchase of Gulf Coast Hospice. The closing statement reflected the final purchase price of $ 1,775,000 and stated that $ 88,750 was being held in escrow. The next day, LHC sent the revised Asset Purchase Agreement that contained all of the terms of sale previously agreed to.
 

 ¶108. Despite LHC's ongoing actions, LHC ultimately refused to close the deal. As a result, although the agreed purchase price with LHC was $ 1,775,000, five months later, Gulf Coast Hospice was sold for only $ 500,000 to another purchaser.
 

 ¶109. "In the interest of justice, if, from the whole pleading, it can be seen that there is substance to the suit, and there is revealed enough to show equitable merits, the Court will go far towards entertaining the bill."
 
 C. E. Frazier Constr. Co. v. Campbell Roofing & Metal Works, Inc.
 
 ,
 
 373 So. 2d 1036
 
 , 1038 (Miss. 1979) (quoting
 
 Dantone v. Dantone
 
 ,
 
 205 Miss. 420
 
 ,
 
 38 So. 2d 908
 
 , 911 (1949) ). Here, genuine issues of material fact exist as to whether LHC's conduct caused Gulf Coast Hospice to change its position in reliance on that conduct and whether that conduct caused Gulf Coast Hospice to suffer detriment. Therefore, I would find that summary judgment was inappropriate.
 

 ¶110. The majority cites
 
 King's Daughters & Sons Circle No. Two of Greenville v. Delta Reg'l Med. Ctr.
 
 ,
 
 856 So. 2d 600
 
 , 607 (Miss. Ct. App. 2003), and its holding that the letter of intent in that case was a contract to make a contract and was not a final contract. However,
 
 King's Daughters
 
 involved a tortious interference claim, not a claim of estoppel. In addition, in that case, a critical factor in determining that a contract had not existed was that the purchase price had not been determined. In this case the parties had determined the purchase price to be $ 1,775,000. Further, no evidence existed in that case that a party had all but taken over King's Daughters hospital or that the conduct of a party had caused the majority of King's Daughters' employees to resign.
 

 ¶111. The majority additionally cites
 
 Knight v. Sharif
 
 ,
 
 875 F.2d 516
 
 (5th Cir. 1989), a case involving two letters of intent for the sale of common stock. In that case, "[a]fter numerous efforts by the parties to negotiate a definitive agreement for the sale of the GAF stock, the ... deadline expired without such an agreement for the sale of the stock having been executed by the parties."
 

 Id.
 

 at 518
 
 . This Court held that the letters of intent did not constitute an enforceable contract for the sale of the stock.
 

 Id.
 

 ¶112. However, the instant case involves much more than the failed purchase of common stock. Gulf Coast Hospice presented evidence that LHC all but took over Gulf Coast Hospice after signing the letter of intent and created unrest within the business. LHC announced to Gulf Coast Hospice's employees, which management stated had been essential to the performance of the business, that LHC intended to acquire Gulf Coast Hospice. LHC then changed the hours, pay scales, and benefits of the employees, effective March 1. LHC acknowledged that its conduct had created unrest with the employees, yet it emailed Gulf Coast Hospice that LHC "remain[ed] committed to" Gulf Coast Hospice, its management, and its staff." As a result of LHC's changes, the majority of Gulf Coast Hospice's employees resigned. Moreover, while Gulf Coast Hospice's employees were resigning, LHC
 

 continued to make material changes to Gulf Coast Hospice's computer systems, accounts, and utility services. Then, after LHC's changes caused Gulf Coast Hospice's employees to resign, LHC refused to close the transaction. As a result, instead of the price of $ 1,775,000, which LHC had offered, Gulf Coast Hospice sold for $ 500,000 five months later, a difference of $ 1,275,000.
 
 In toto
 
 , Gulf Coast Hospice presented satisfactory evidence to create a jury questions about whether LHC's actions, words, and performance consummated the contract and about whether the contract should be enforced through the doctrine of estoppel. As a result, summary judgment was inappropriate. I would find that a jury should determine the outcome of the case.
 

 ¶113. Viewing the evidence in the light most favorable to Gulf Coast Hospice, I would find that Gulf Coast Hospice presented sufficient evidence of the existence of genuine issues of material fact and would remand this case for a trial on the merits. Accordingly, I dissent.
 

 KITCHENS, P.J., JOINS THIS OPINION.